**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darrell SULLIVAN, Defendant–Appellant.**

**No. 95–1336.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1995.

Decided Jan. 26, 1996.

Steven D. DeBrota, Office Of The United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

John P. Brinson, John D. Clouse, Clouse Law Offices, Evansville, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

Defendant Sullivan appeals the sentence imposed upon him for violating 18 U.S.C. § 876, which prohibits the mailing of threatening communications. He contends that the district court erred both in refusing a downward departure on grounds of diminished mental capacity and in imposing a six-level increase in base offense level for "conduct evidencing an intent to carry out [his] threat[s]." USSG § 2A6.1(b)(1).

### Background

Prior to 1990, Sullivan was married and the father (or so he believed) of three children. He was employed as a truck driver for Hillcrest Trucking. In 1990 he learned that he was not, in fact, the father of the third child his wife had borne and that his wife, Lydia, intended to divorce him. In December of 1990 his divorce became final and Lydia was granted custody of the children. Judge Judith Dwyer presided over the divorce proceedings. Lydia later married Robert Perdue, the father of her third child.

After his marriage fell apart, Sullivan's mental health deteriorated. According to the psychologist engaged by the government, Sullivan began to experience paranoid delusions; he believed that he was being persecuted. Forensic Rep., Def.App. at 41–46. He became convinced that Robert Perdue was abusing his children. He also believed that a man named Ernie Hudson had been murdered and that the authorities were not properly investigating the murder. Sullivan reported these beliefs to the police and Officer Michael Healy was one of those who investigated the allegations.

Sullivan's belief that he was being harassed led to several incidents in early 1992. On January 8, Sullivan shot out the windows of Robert Perdue's car and truck. One of the deer slugs fired at the truck entered Perdue's house, narrowly missing his sleeping son. Following this incident, Judge Dwyer granted a petition to terminate Sullivan's child visitation rights. He was also convicted of criminal recklessness in a proceeding over which Judge Dwyer presided and sentenced to a term of probation. Two of Sullivan's coworkers also obtained orders of protection against Sullivan at this time on grounds that he had threatened them. These threats were also apparently related to Sullivan's belief that he was being persecuted. (He alleged that the wife of one of these coworkers was passing out flyers at his children's school warning against him.) Judge Robert Arthur presided over these orders of protection proceedings.

In May 1992, after these events, Sullivan left Indiana to stay with a relative in Mesa, Arizona. In February and early March of 1993, Judges Arthur and Dwyer, Robert Perdue, Officer Healy and Sue Hedrick, a secretary at Hillcrest Trucking, all received letters later determined to be in Sullivan's handwriting. These letters, which contained various accusations and threatening comments, formed the basis for Sullivan's conviction in the case at hand.

Sullivan was arrested in Arizona on March 26, 1993 and returned to Indiana. On April 14, 1993 he was transported from a jail in Indianapolis to another in Daviess County by Sheriff Allen Evans. Sheriff Evans later testified that during the ride Sullivan "blurted out that he had wrote [sic] the letters and that if they gave him any more time, he would carry out the threats." Sentencing Tr., Def.App. at 33.

Sullivan was tried on September 6, 1994 and convicted by a jury of five counts of violating the federal statute banning threatening communications. 18 U.S.C. § 876. Prior to the trial, Sullivan was examined by a forensic psychologist who found him competent to stand trial but opined that "at the time of the alleged offenses, Mr. Darrell Sullivan was suffering from a mental disease which would have prevented him from being aware of the nature, quality, or wrongfulness of his actions. It is the opinion of this evaluator that he was not responsible for his actions at the time of the alleged offenses." Forensic Rep., Def.App. at 46. In spite of this evaluation, Sullivan withdrew a previously filed Notice of Intent to Rely upon the Defense of Insanity and proceeded to trial without relying on that defense. Sullivan was sentenced on January 20, 1994 pursuant to USSG § 2A6.1, *Threatening Communications.* That guideline provides a base offense level of 12. Part (b) of the guideline states: "If the offense involved any conduct evidencing an intent to carry out such threat, increase by 6 levels." The district court imposed the six-level enhancement, basing its ruling both on Sullivan's remarks to Sheriff Evans and on his earlier shooting out of the windows of Robert Perdue's vehicles. Sentencing Tr., Def.App. at 34–37.

The district court also denied Sullivan's request for a downward departure under USSG § 5K2.13, *Diminished Capacity,* which states:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

USSG § 5K2.13.

This ruling was based on *United States v. Poff,* 926 F.2d 588 (7th Cir.1991) (*en banc* ),

*cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991), which construed the Sentencing Guidelines so as to make "crime of violence," as used in the Career Offender Guideline, USSG § 4B1.1, mutually exclusive of "non-violent offense," appearing in § 5K2.13. Because the sending of threatening communications is considered a crime of violence for purposes of assessing career offender status, the district court ruled, under *Poff,* that a downward departure under § 5K2.13 was unavailable in the present case.

## Analysis

### A. The § 5K2.13 Departure

■ Sullivan concedes that *Poff* is directly on point in its holding that threatening communications, because they are "crimes of violence" under § 4B1.1, cannot constitute "non-violent offenses" for § 5K2.13 purposes. He correctly points out that *Poff* was narrowly decided and that, since the *Poff* decision, the Fourth and District of Columbia Circuits have opted for the approach advocated by the *Poff* dissent.[1] He also makes a constitutional argument that distinguishing between those convicted of violent and non-violent offenses in § 5K2.13 constitutes a denial of due process and equal protection under the law. He argues that there is no rational basis for refusing the benefit of mitigation for diminished mental capacity to those defendants charged with violent offenses. He bases this contention on the fact that those convicted of the most heinous violent crimes, who face the death penalty, and those convicted of non-violent offenses are both accorded consideration of diminished mental capacity on an individual basis. This argument is clearly without merit. The decision to impose life imprisonment rather than a death sentence rests on entirely different considerations than undertaking a downward departure which will result in an individual's earlier release into society. The fact that diminished mental capacity may play a role both in choosing between execution or imprisonment of a convicted killer and in setting the prison term of a non-violent offender implies nothing for other violent offenders. Since physical danger to the public may be involved, it is not irrational to exclude consideration of diminished mental capacity from the determination of sentences for violent crimes.

In any event, this panel is bound by the *en banc* decision in *Poff* and thus we affirm the district court's denial of a downward departure under § 5K2.13.

### B. The § 2A6.1(b)(1) Enhancement

Sullivan raises three arguments in opposition to the district court's finding that he engaged in conduct evidencing an intent to carry out his threats. First, he argues that, as a matter of law, conduct occurring prior to the making of a threat cannot provide the basis for a § 2A6.1(b)(1) enhancement. Second, he argues that his comments to Sheriff Evans constitute additional threats which are not cognizable as "conduct" under § 2A6.1(b)(1). Finally, he argues that, even if both the shooting incident and the comments to Sheriff Evans are cognizable conduct under § 2A6.1(b)(1), they do not provide sufficient evidence of an intent to carry out his threats. We address each of these arguments in turn.

---

1. *Poff* was decided by a 6-to-5 vote. In *Poff,* the majority relied primarily on "the natural reading" of the phrases "crime of violence," used in § 4B1.2, and "non-violent offense," used in § 5K2.13, as "contrapositives." *Poff,* 926 F.2d at 592. A number of cases from other circuits have, either implicitly or directly, agreed with this approach. *See, e.g., United States v. Dailey,* 24 F.3d 1323, 1325–27 (11th Cir.1994); *United States v. Rosen,* 896 F.2d 789, 791 (3d Cir.1990); *United States v. Borrayo,* 898 F.2d 91, 94 (9th Cir.1989); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir.1989). The *Poff* dissenters, however, noted that the term "crime of violence" is used in § 4B1.2 in an abnormal sense as a term of art according to which "whether a crime is one 'of violence' depends on its elements and not on the defendant's conduct." *Poff,* 926 F.2d at 594 (Easterbrook, J., dissenting). Reading § 5K2.13 as a whole to say that "when incapacitation is not an important justification for punishment, mental condition may be the basis of a departure," the dissenters argued that the phrase "non-violent offense" in § 5K2.13 should be interpreted so that judges are "not required ... to treat the innocuous threatener and the murderous one identically." *Id.* at 595. The Fourth and District of Columbia Circuits have adopted the reasoning of the *Poff* dissent. *United States v. Chatman,* 986 F.2d 1446 (D.C.Cir.1993); *United States v. Weddle,* 30 F.3d 532 (4th Cir.1994).

■ The Second Circuit has held that "[a] person cannot take action that will constitute proof of his intent to carry out a threat until after the threat has been made." *United States v. Hornick,* 942 F.2d 105, 108 (2d Cir.1991), *cert. denied,* 502 U.S. 1061, 112 S.Ct. 942, 117 L.Ed.2d 112 (1992). While this interpretation is consistent with the literal wording of the guideline, other courts have pointed out that a narrow focus on the timing of the conduct purportedly evidencing an intent to act on a threat is not consistent with the Sentencing Commission's purpose in including the enhancement. That purpose is set out in the Background Commentary to § 2A6.1: "These statutes cover a wide range of conduct, the seriousness of which depends upon the defendant's intent and the likelihood that the defendant would carry out the threat. The specific offense characteristics are intended to distinguish such cases." As the Ninth Circuit noted in *United States v. Hines,* 26 F.3d 1469, 1474 (9th Cir.1994), "[t]he critical issue should not be the timing of the conduct, but whether the conduct shows the defendant's intent and likelihood to carry out the threats." *Accord, United States v. Gary,* 18 F.3d 1123, 1127–28 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 134, 130 L.Ed.2d 77 (1994). This court, in dicta, has suggested that conduct occurring prior to a threat can be relevant in ascertaining the seriousness of the threat under § 2A6.1. *United States v. Fonner,* 920 F.2d 1330, 1332 (7th Cir.1990). We now confront the issue squarely and, consonant with *Fonner,* find that conduct occurring prior to the making of a threat is not excluded as a matter of law from consideration as evidence of an intent to carry out the threat.

Given the purpose of § 2A6.1(b)(1), we cannot agree with Sullivan that there should be a hard and fast rule precluding consideration of any conduct occurring prior to the charged threatening communications. The mere fact that conduct occurred prior to the issuance of a threat should not place that conduct beyond the district court's consideration as it attempts to gauge the seriousness of a threat and the likelihood that it will be carried out. Instead of focusing on timing, the analysis of whether conduct evidences an intent to carry out a threat should concentrate on assessing the connection between the threats and the conduct at issue. Frequently, the fact that a defendant engaged in particular conduct prior to making a threat will suggest that there is little connection between the threat and the prior conduct. However, in other cases a threatening letter may be only part of a long course of harassing behavior on the part of the defendant. In such cases the district court should not be precluded from considering the nature and extent of the prior harassment in assessing the seriousness of the threat. This emphasis on the nexus between the prior conduct and the current threat is consistent with the approach taken in other cases.[2]

■ In the case at hand, the threatening letters mailed by Sullivan to various people connected with his family problems are closely connected to the shooting incident which occurred several months earlier. The connection is clear from the choice of recipients of the letters and from the fact that Sullivan referred specifically to the shooting in his letter to Robert Perdue. As the district court noted at sentencing, the language of the letters "ties the prior acts to the threats; therefore ... implicating 2A6.1." Sentenc-

**2.** *See, e.g., United States v. Sauerwein,* 5 F.3d 275 (7th Cir.1993) (attempts to form an organization dedicated to the overthrow of the federal government evidenced intent to carry out threats on president's life); *United States v. Hill,* 943 F.2d 873 (8th Cir.1991) (intent to carry out threats to kidnap girl evidenced by return to town where she lived, attempt to hide out until school let out and statement of intention to paint car to avoid authorities); *United States v. Jimenez–Otero,* 898 F.2d 813 (1st Cir.1990) (brandishing screwdriver while making threat evidenced intent to carry out threat); *Fonner* (knifing of police officer's partner fifteen years earlier relevant to serious-

ness of threat which included specific mention of the partner); *Hines* (prior purchase of gun and unsuccessful trip to Washington for purpose of killing president evidenced intent to carry out threat to kill president); *Gary* (prior harassment, violence and threats against ex-girlfriend constituted evidence of intent to carry out threat to her life); *United States v. Philibert,* 947 F.2d 1467 (11th Cir.1991) (enhancement improper where there was no connection between prior acquisition of weapons or leaving severed horse's head on courthouse steps and threats against former employment supervisor).

ing Tr., Def.App. at 37. The district court thus did not err in weighing the shooting incident as evidence that Sullivan qualified for the § 2A6.1(b)(1) enhancement.

■ Next, Sullivan argues that his statements to Sheriff Evans are merely "additional subsequent threats" and are not conduct cognizable under § 2A6.1. He points out that the six-level enhancement dictated by § 2A6.1(b)(1) is much greater than the increase in base offense level which would have resulted if he had been convicted of an additional count under 18 U.S.C. § 876 for making the statement to Sheriff Evans. Sullivan contends that this apparent paradox is resolved only if the conduct referred to in § 2A6.1(b)(1) is construed to mean "overt activity" and not to include additional threats.

Sullivan's analysis is flawed because it fails to appreciate the distinct factual issues presented by the threshold determination, made at trial, of whether a defendant has violated 18 U.S.C. § 876 by sending threatening communications and the subsequent determination, relevant only to sentencing, of whether "the offense involved any conduct evidencing an intent to carry out the threat." The sending of threatening communications is a crime quite apart from any intent to carry out the threats. The harm against which the statute guards includes the infliction of fear and anxiety regardless whether the sender means to inflict the threatened injury. *United States v. Aman*, 31 F.3d 550, 554–56 (7th Cir.1994). Thus, under the statute, the mailing of each threat constitutes a new injury, which, under the Sentencing Guidelines, forms the basis for an increase in sentence. This increase in sentence serves to punish and deter the making of repeated threats.

The purpose behind the increase in sentence which accompanies each separate violation of the statute is thus quite distinct from the purpose behind the § 2A6.1(b)(1) enhancement. This measure is intended to punish more severely those threats which, but for the intervention of law enforcement, would likely have been carried out. In assessing whether a defendant intended to carry out a threat, courts have looked not only to the "overt activity" surrounding the

threat, but even to the nature of the threats themselves. *See, e.g., United States v. Bellrichard,* 62 F.3d 1046 (8th Cir.1995) (considering "the language of the threatening communications"); *United States v. Kirsh,* 54 F.3d 1062 (2d Cir.) (relying, in finding intent, on the connection between the language of the threats and the nature of the weapons possessed by defendants), *cert. denied,* —— U.S. ——, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *Gary* (relying in part on the fact that threatening letters contained information concerning victim's whereabouts which indicated defendant had been stalking her); *United States v. Harris,* 763 F.Supp. 546 (M.D.Ala.1991) (looking at "the number and nature of the letters themselves").

It was thus no error for the district court to consider the defendant's reiteration of his threats to Sheriff Evans in determining whether an enhancement under § 2A6.1(b)(1) was warranted. We appreciate Sullivan's concern that sentences not be enhanced simply because a defendant made an uncharged threat. Indeed, it is the responsibility of the district court to distinguish mere talk from talk which evidences an intent to act. The proper inquiry for the district court is thus whether any threat, charged or uncharged, was made in a manner or under circumstances which suggest an intent to carry out the threats which form the basis of the conviction.

■ Having concluded that both the earlier shooting incident and the comments to Sheriff Evans could properly be weighed by the sentencing judge, we arrive at Sullivan's third argument against the § 2A6.1(b)(1) enhancement, which is that the district court erred in doing the weighing. We review the district court's determination in this regard for clear error.

In imposing the six-level enhancement, the district court relied on both the shooting incident and the defendant's repetition of his threats to Sheriff Evans. Sentencing Tr., Def.App. at 34–37. The sentencing judge pointed out that the fact that Sullivan had previously acted out his hostility allowed the threatening communication "to carry more weight than if it were the first such commu-

nication by the defendant." He also noted that the letter sent to Robert Perdue specifically mentioned the deer slug, thus "t[ying] the prior acts to the threats." Here, as in *Fonner*, the district court properly considered this direct connection between the prior violent act and the threat in assessing the seriousness of the threat.

The district court also relied on Sullivan's statement to Sheriff Evans that "if they gave him any more time, he would carry out the threats." Sentencing Tr., Def.App. at 33. Such a statement, standing alone, might be dismissed as mere blowing off steam after an arrest, insufficient to support a § 2A6.1(b)(1) enhancement. Here, however, the sentencing judge considered this statement as only one piece of evidence in his decision to impose the enhancement. Surely the fact that Sullivan continued his threats even after being arrested and in the presence of a law enforcement officer counts against him to some degree.

In response to this evidence Sullivan points out that at the time he wrote the threatening letters he had voluntarily moved miles away from the recipients. He also points out that at the time he was arrested he possessed no weapons, and that the only weapon he had ever possessed was the shotgun used to shoot out Robert Perdue's windows, which he turned over to police when he surrendered himself after that incident.

We agree that these factors weigh in opposition to those upon which the district court relied in making its determination. However, our role is not to redo the balancing of evidence, which is the purview of the sentencing judge, but only to determine whether the balancing was so inconsistent with the evidence presented as to constitute clear error. Given the shooting incident, the fact that Sullivan specifically connected his threats to that incident and Sullivan's statement after arrest that he still intended to carry out his threats (at least if "they gave him any more time"), we find no clear error here.

Finally, we point out that Sullivan has not argued that any of the conduct relied upon by the sentencing judge in imposing the enhancement was not conduct which the "of-fense involved." § 2A6.1(b)(1). Had he made such an argument we might have faced a closer question. For § 2A6.1(b)(1) took its current form in November 1993 pursuant to guideline Amendment 480. The previous version of the guideline imposed the six-level enhancement "if the *defendant's* conduct involved any conduct evidencing an intent to carry out such threat." USSG, Amendment 480 (emphasis supplied). The purpose of the amendment was to "delete language that could be construed as a limitation on the scope of conduct for which a defendant is accountable under § 1B1.3 (Relevant Conduct) and replace it with language consistent with that used in other offense guidelines." *Id.* The amendment apparently responded to the possibility that the previous language precluded consideration of any conduct of others for which a defendant was responsible under § 1B1.3, *Relevant Conduct*. Thus, the amendment was intended to broaden the scope of conduct which could be considered as grounds for the six-level enhancement.

However, the new wording may also limit consideration of the defendant's own conduct to that which "the offense involved." "Unless otherwise specified," the scope of conduct cognizable under those guidelines, such as § 2A6.1(b)(1), which control determination of specific offense characteristics is defined by the Relevant Conduct guideline, § 1B1.3. Cases decided under the old version of § 2A6.1(b)(1) apparently assumed that, since the guideline made no reference to offense conduct but specified simply "the defendant's conduct" no determination as to whether the conduct was "relevant conduct" under § 1B1.3 was necessary. Now that Amendment 480 has made the language of § 2A6.1(b)(1) "consistent with that used in other offense guidelines," it is an unresolved question whether the evidence of intent to carry out a threat must be limited to "relevant conduct" as defined by § 1B1.3.

Sullivan has not argued that any of the conduct considered by the sentencing judge fails to qualify as conduct which "the offense involved," nor do any of the cases he cites discuss the proper construction of this phrase. The issue not being properly before us, we need not, and do not, resolve the

interpretation of the guideline phrase "if the offense involved any conduct" at this juncture.

### Conclusion

In summary, we affirm the sentencing determination of the district court, both in its decision to impose the § 2A6.1(b)(1) enhancement and in its denial of the motion for downward departure under § 5K2.13.

AFFIRMED.