**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert W. CARTER, Defendant–
Appellant.**

No. 96–1553.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1997.

Decided April 11, 1997.

510

Brian W. Blanchard (argued), Office of the United States Attorney, Criminal Division, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff-Appellee.

Andrew M. Cohen (argued), Lawrence A. Wilk, Wayne M. Waller, Wilk & Waller, Chicago, IL, for Defendant-Appellant.

Before MANION, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Because a jury convicted Robert Carter of threatening a former prostitute (Carter was her pimp) who worked for him, we will assume the facts as presented by the govern-

ment to be true. The charge against Carter—transmitting in interstate commerce a communication containing a threat to injure another person in violation of 18 U.S.C. § 875(c)—was presented to a jury in 1995. The sentencing proceeding which followed the conviction was conducted over several days, and in 1996 Carter received a term of 34 months in prison along with a small fine and a period of supervised release. He appeals.

Carter was 28 years old in 1976 when he met Zelda Pfeifer (not her real name but we see no reason for using the woman's real name in a published opinion) in a pool hall in Dallas, Texas. Pfeifer, who was 19 years old at the time, moved in with Carter, who schooled her on becoming a prostitute.

Ms. Pfeifer was one of a number of women (some actually were young girls) who worked under Carter's control in street-level prostitution and obtained money from wealthy "johns." Pfeifer stayed with Carter—sometimes on and off—for many years. During this time Carter abused—physically and emotionally—Pfeifer on a regular basis.

Eventually Pfeifer left Carter and settled in Chicago. Carter, meanwhile, was living in Seattle, Washington. The threatening telephone call in this case originated from Seattle when Carter called Pfeifer in an attempt to find "Max," his son from another prostitute who lived with him as part of his family.

Pfeifer, married and living in Chicago with her husband in 1994, received several threatening calls from Carter, who thought she knew where Max could be found. Fearful, Pfeifer called the FBI, who put a tape device on her phone and suggested she call Carter and tell him not to call her again at work for she might lose her job.

Soon after Pfeifer's phone was rigged, Carter called again. Here is part of what he said as recorded on tape:

> When you and half of your husband head come off, then you'll know. I ain't playing with you, girl.... I'm gonna tear both of your heads off and I'm telling you when I come to Chicago, the, the force of hell coming to loose.... Give me my son and stop playing me.
>
> I don't give a fuck about the police. I don't give a fuck about him [Pfeifer's husband] having guns, cause he got to have, the shit that I got? He don't stand a chance.... I'm telling you ... you playing with death.
>
> You, you fixing to get your husband and you fucked off. And you put him in shit he don't even know what he's in. You better tell him he ain't fooling with no kid, he ain't fooling. I got cousins in that motherfucker [Chicago], that's killers, bitch. I got real killers in that motherfucker [Chicago].
>
> You could have the Feds on that motherfucking phone. I wouldn't give a fuck. I'd die for my son any day of the week.... [H]ell is coming to your household.... And when I come to [Pfeifer's address], I ain't gonna be playing.... I'm telling you now I'm slicker than grease, and when I make my move, you and him, neither one of you have a chance.

At one point in the phone conversation Carter expressly referred to one of his guns, a "street sweeper," which Pfeifer had seen several times. He said he would bring it with him to Chicago.

On appeal, Carter argues that a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), violation and his ineffective trial counsel require a reversal of his conviction. Failing that, he challenges the district court's finding that he deserved placement in a higher criminal history category and that his conduct showed "an intent to carry out" the threat. We begin with the *Batson* claim.

Carter is black and Pfeifer is white. The *Batson* challenge concerns a member of the jury pool, Tracy Whittaker, a black woman who lived with her boyfriend, a Chicago police officer. During the jury selection process, Whittaker said she and her boyfriend sometimes heatedly discussed his job because while she is "very pro-black" he is "just the opposite" and sometimes he justifies arrests due to a suspect's being black. She stated that her usual response to her boyfriend is, "Well, you can't blame them."

Whittaker first told the court these heated discussions with her boyfriend would not affect her service as a juror, but when later asked by the judge whether her decision making would be influenced by the races of Carter and Pfeifer, Whittaker said: "I don't feel that it will, but, like I say, I am very pro-black." Whittaker also reported a negative experience with police regarding their response when she reported an attack on her sister. Whittaker said a 911 dispatcher hung up on her, and when she called the police on her sister's behalf they were "very rude." Whittaker acknowledged she was hostile to the police officers when she called and believed the dispatcher's action was uncalled for because "her job is to take whatever it is that is issued to her." When asked whether this negative experience would affect her service as a juror, Whittaker said she "[did]n't believe" she would be influenced by the episode.

The government's peremptory strikes included Whittaker, but three other black venire members went unchallenged by the government and were seated on the jury. After Carter complained that by striking Whittaker the government violated *Batson,* the district court asked the government to explain its strike. The AUSA said he questioned Whittaker's ability to serve as an unbiased juror in light of her disagreements with her police officer boyfriend regarding the treatment of blacks by police, her reiteration that she was "pro-black" when asked if she could be neutral regarding the defendant's and alleged victim's different races, as well as her prior negative experiences with law enforcement officers.

■ The district judge rejected the *Batson* challenge, finding that the government did not strike Whittaker due to her race or commit purposeful discrimination.[1] We accord this finding of fact great deference on

appeal and will overturn the district court's finding only if it is clearly erroneous. *Hernandez v. New York,* 500 U.S. 352, 364, 369, 372, 111 S.Ct. 1859, 1869, 1871, 1873, 114 L.Ed.2d 395 (1991); *United States v. Cooper,* 19 F.3d 1154, 1160 (7th Cir.1994). And when there are two permissible views of the evidence, the fact finder's choice cannot be clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ We choose not to disturb the district judge's finding on this point, as she took a permissible view of the evidence. Based on our review of the record, the government reasonably viewed Whittaker's arguments with her police officer boyfriend and negative experiences with police and the 911 dispatcher as possibly affecting how she would interpret the actions of law enforcement officers in this case. The government's skepticism of Whittaker's ability to judge the case fairly was further enhanced because Whittaker's arguments with her boyfriend focused on the treatment of black suspects by police. The government reasonably could think her comments indicated a belief that law enforcement officers generally are racially bigoted. Her "pro-black" statement in describing her position during disagreements with her boyfriend could plausibly be interpreted by the government attorney as meaning more than simply pride in her heritage, which is how Carter interprets her comments. Moreover, Whittaker's responses when asked whether she could fairly decide the case were equivocal.

■ *Batson* protects a defendant against peremptory challenges made solely on account of race or "on the assumption that black jurors as a group will be unable impartially to consider the ... case against a black defendant." *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. The record here supports the

1. *Batson* sets forth a three-step evaluation of jury selection challenges: first, a defendant must establish a *prima facie* case that a juror was struck because of race; second, the burden shifts to the government to articulate a racially neutral explanation for striking the juror; third, a court must determine whether the defendant has carried the burden of proving purposeful discrimination. *Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1722–24; *United States v. Cooper,* 19 F.3d 1154, 1158 (7th Cir.1994). Where, as here, a prosecutor has offered a race-neutral explanation for the peremptory challenge, the test is compressed down to the ultimate question of intentional discrimination; the preliminary question of a *prima facie* case becomes moot. *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion); *Cooper,* 19 F.3d at 1160. We therefore will review only the ultimate finding of the district court.

district court's conclusion that the government attorney did not run afoul of *Batson* when he elected to try this case without Whittaker on the jury panel. *Batson* does not prevent consideration of a potential juror's own admitted prejudices just because the potential juror and the defendant are of the same race.

In *United States v. Hinton,* 94 F.3d 396 (7th Cir.1996), we upheld the denial of a *Batson* challenge where government counsel explained he exercised his peremptory strike of a black venire member because the member wore a "Malcolm X" hat, which counsel believed indicated an anti-government attitude, and because the member exhibited negative body language when the government introduced its case agent and read its list of witnesses. Compared to *Hinton,* the government's concerns here easily presented justifiable and permissible race-neutral reasons for striking Whittaker. We, like the savvy district judge, find no basis for concluding that *Batson* was violated.

■ Carter next argues that his trial counsel rendered ineffective assistance by failing to present an entrapment defense. Under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), Carter must demonstrate not only that his trial attorney's performance was deficient, but also that the deficiency prejudiced him. To establish prejudice Carter must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. And because Carter thinks that if his trial counsel had presented an entrapment defense he would not have been convicted, he needs to show (1) government inducement of the crime and (2) a lack of predisposition on his part to engage in the criminal conduct. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Jones,* 21 F.3d 165, 171 (7th Cir.1994).

■ Carter contends that by having Pfeifer call him, the FBI agents entrapped him. The record, however, does not support the claim. At the very most, Pfeifer's message to have Carter call affected only the timing of his telephone call back to her, it could not reasonably be viewed as provoking what he said in the return call. Moreover, the trial evidence indicates Carter—who regularly used violence and threats of violence toward members of his prostitution "family"—not only was predisposed to threaten Pfeifer (and her husband) but that he was doing so for a few days before the FBI agents even entered the picture.

■ Carter's remaining issues involve his 34-month sentence, which arose from the combination of a guidelines total offense level of 18 and a category III criminal history. According to Carter, neither the offense level nor criminal history category were factually supported by sufficient evidence. We review the district court's factual findings at sentencing only for clear error. *United States v. Fones,* 51 F.3d 663, 665 (7th Cir.1995).

■ To reach the total offense level of 18 the district judge applied a 6-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1) because she found that Carter had the intent to carry out his threats. Section 2A6.1(b)(1) "is intended to punish more severely those threats which, but for the intervention of law enforcement, would likely have been carried out." *United States v. Sullivan,* 75 F.3d 297, 302 (7th Cir.1996). In deciding whether to apply the enhancement, courts may evaluate not only a defendant's overt activity connected to the threat, but also the nature and seriousness of the threats themselves. In cases where a threat is only part of a long course of harassment, the court may consider prior conduct in assessing the seriousness of the threat. *Id.* at 301–02.

■ Carter argues that his past violence was spontaneous, not planned, so because he had no plane ticket for Chicago or packed bags when he was arrested, the enhancement was not justified. This argument falls flat. Carter directly connected his threats to a weapon Pfeifer knew he owned—the "street sweeper." Also, when Carter was arrested in Seattle following the recorded call he had a Colt .45 semi-automatic pistol tucked in the waistband of his pants and three loaded, matching magazines in his pocket. A search of one of his residences produced the "street

sweeper." The fact that Carter actually owned and carried firearms shows an easy ability to carry out his threatened violence, making his threats more than mere puffery. *See United States v. Kirsh,* 54 F.3d 1062 (2d Cir.) (finding intent to carry out threats based on possession of firearms by defendants at time threats referencing firearms were made), *cert. denied,* —— U.S. ——, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995). In a similar vein, prior to September 1994 Carter mentioned to Pfeifer that he had cousins in Chicago, so his threats during the recorded phone call connected directly to a means of execution. Moreover, the record indicates Carter is a violent man who used force often in his long relationship with Pfeifer. *See Sullivan,* 75 F.3d at 302 (enhancement imposed due in part to fact that defendant previously acted out his hostility toward victim). Furthermore, during the recorded call Carter mentioned not only that he knew where Pfeifer lived, but he noted the address and referred to his contacts in Chicago who could carry out the violence for him if he did not come to Chicago. *See United States v. Gary,* 18 F.3d 1123 (4th Cir.1994) (enhancement justified in part because threats contained information on victim's whereabouts). In sum, the nature of Carter's threats, his possession of weapons specifically referred to in connection with the threats, and his past physical abuse of Pfeifer all more than sufficiently support the district judge's reasons for invoking the § 2A6.1(b)(1) enhancement.

■ Carter's final contention concerns the district court's upward departure from criminal history category I to category III pursuant to U.S.S.G. § 4A1.3 because Carter's record did not reflect the seriousness of his past criminal conduct. Carter does not challenge the degree of departure, but instead whether the court could depart at all. We therefore review the district judge's decision to depart to see if she stated adequate grounds for the move and whether the facts cited in support of the departure actually exist. *United States v. Archambault,* 62 F.3d 995, 1000 (7th Cir.1995).

■ Carter says the district judge erred in relying upon mere assertions of prior criminal conduct that did not result in criminal charges or convictions. This argument is defeated by § 4A1.3 itself as well as by our prior decisions. Section 4A1.3 simply requires "reliable information" regarding a defendant's prior conduct, and specifically includes information regarding "prior similar adult criminal conduct not resulting in a criminal conviction." Nothing in the provision or its background note requires the prior conduct to have resulted in formal charges. The section's background note regarding use of the departure upward for "a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the past" actually suits Carter to a tee. In *United States v. Ruffin,* 997 F.2d 343, 346 (7th Cir.1993), we said prior *conduct* rather than prior convictions or charges determines whether an upward departure is appropriate. In *Ruffin,* we noted that even charges on which a defendant has been acquitted or for which charges have been dismissed can be considered under § 4A1.3 so long as the evidence presented by the government is reliable (i.e., proved by a preponderance of evidence). *Accord United States v. Watts,* —— U.S. ——, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). The district judge's departure due to Carter's prior violent but uncharged assaults was properly considered and credited.

■ Carter also believes the government's allegations of his prior violent activity do not rise to the level of reliability required for application of § 4A1.3. This contention is defeated by the record. The district judge heard evidence of Carter's history as a pimp and of numerous instances of violence toward his prostitutes and others, including one episode of attempted murder (which, in fact, was charged). Carter presented no contrary evidence regarding any of the instances of physical abuse, and his attorney acknowledged Carter's violence. Instead, Carter merely contended that Pfeifer and the other former prostitute who testified at sentencing were biased and out to "pay him back" and that he was violent only because he was hotheaded and couldn't control his impulses. The district judge found the two women credible, and we find no reason to disturb

that ruling. Carter, in short, presented nothing indicating that the evidence of his past violent behavior—regardless of whether it was ever the basis for charges or convictions or whether it was deliberate or impulsive—was unreliable or that the described episodes didn't occur. The district court found the record "overflowing with evidence that Carter managed his criminal enterprise with violence," including an attempted murder that spoke "volumes about Carter's grave disrespect for society and his dependence on assaultive behavior." Having made no acceptable challenge to these prior acts, Carter's argument fails.

AFFIRMED.