**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony THOMAS, Defendant–Appellant.**

No. 97–3456.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1998.

Decided Aug. 11, 1998.

Frances C. Hulin, Stephen A. Kubiatowski (argued), Gregory M. Gilmore, Office of United States Attorney, Springfield, IL, for Plaintiff-Appellee.

David B. Mote, Thomas W. Patton (argued), Office of Federal Public Defender, Springfield, IL, for Defendant–Appellant.

Before CUMMINGS, CUDAHY, and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Between October 1992 and September 1994, Anthony Thomas sent five death threats to Carol Evans Walker, an Illinois Assistant State's Attorney who successfully prosecuted him for armed robbery. Thomas was eventually charged with and convicted of two counts of mailing threatening communications, in violation of 18 U.S.C. § 876. The district judge sentenced Thomas to 60 months on each count, to be served consecutively after Thomas' release from the Illinois Department of Corrections (IDOC). The district judge also sentenced Thomas to three years of supervised release and a $100 special assessment. On appeal, Thomas challenges the admission of certain evidence, the imposition of a six-level increase in his base offense level pursuant to United States Sentencing Guideline (U.S.S.G.) § 2A6.1(b)(1) and the refusal to group his counts under U.S.S.G. § 3D1.2. We affirm Thomas' conviction, but remand for reconsideration of his sentence.

I. Testimony of Jack Rivera

■ Jack Rivera, an IDOC correction counselor, testified at trial about a disciplinary hearing that was held to determine whether Thomas was responsible for the letter sent to Walker in October 1992. This same letter formed the basis of Count 1 of the indictment. On direct examination, Rivera read a paragraph of the summary he prepared after the IDOC hearing:

Records of proceedings. Report read. [Anthony Thomas] admits he told investigator that he allowed his brother ... to use [Anthony Thomas'] name and [prisoner] number on a letter that his brother wrote. [Anthony Thomas] admits he made admission to investigator "if he saw Carol Evans Walker on the street, he would catch a battery case on her" but states he was referring to his brother's feelings. [Anthony Thomas] states Carol Walker prosecuted his brother not him.

Tr. 52–53. On cross, the defense emphasized that Thomas had denied writing the letter:

Defense: Officer Rivera, based on the fact that your report says that Anthony Thomas told you someone else wrote the letter, Anthony Thomas denied writing the letter?

Rivera: You could draw that conclusion.

Defense: Now, Anthony Thomas does have brothers, correct?

Rivera: I don't know.

Defense: You didn't feel that was important to even find out?

Rivera: At this—today, I don't know what his family status is.

Tr. 55. On redirect, the government clarified that the IDOC was interested in whether Thomas was the mastermind behind the letter, not whether Thomas had actually put pen to paper and written the letter himself:

Gov't: Based on what you have in your report, in the summary, you were interested in determining whether the Defendant was responsible for sending this threatening letter, not who wrote it; is that a fair statement?

Rivera: Correct.

Gov't: And you determined that Defendant was responsible for this threatening letter?

Defense: Your Honor, I object to what the conclusions were drawn by a disciplinary panel at the Department of Corrections.

Court: No, if it has to do with this matter, I think it's relevant. I'll allow it. Overruled.

Rivera: Could you repeat the question please?

Gov't: Sure. Did you determine that the Defendant was responsible for mailing a threatening communication to Carol Walker?

Rivera: Correct.

Tr. 56–57. On appeal, Thomas argues that the jury may have reasoned that because the IDOC determined that Thomas was responsible for the October 1992 letter, he was guilty of the crimes charged in the indictment. Therefore, Thomas asserts, the probative value of Rivera's testimony was substantially

outweighed by the danger of unfair prejudice, and the district court should have excluded Rivera's testimony pursuant to Federal Rule of Evidence 403. Although we afford a significant amount of deference to a district court's Rule 403 determination, *see United States v. Smith,* 80 F.3d 1188, 1193 (7th Cir.1996), we agree with Thomas that the district court abused its discretion in permitting testimony about the result of the IDOC hearing.

Unsurprisingly, the government does not argue that Rivera's statement is the sort of evidence that is ordinarily admissible. The probative value of the testimony was limited at best, since the sole purpose of the hearing was to determine whether Thomas should be disciplined under IDOC policies, not whether Thomas had violated federal criminal law. *Cf. United States v. Hanahan,* 798 F.2d 187, 189 (7th Cir.1986). And the risk of unfair prejudice was substantial. The jury was unaware that Thomas was not given the procedural protections that exist in federal court, *see Lenea v. Lane,* 882 F.2d 1171, 1174 (7th Cir.1989), or that the IDOC did not have to decide whether Thomas was guilty beyond a reasonable doubt. From the jury's vantage point, the IDOC had resolved one of the issues in the criminal trial—whether Thomas caused the October 1992 letter to be sent to Walker. *See* Indictment, Count 1; 18 U.S.C. § 876.

■ The government relies on the principle that if a party opens the door to evidence that would ordinarily be inadmissible, he cannot complain about the admission of the evidence on appeal. *See United States v. Moore,* 115 F.3d 1348, 1358 (7th Cir.1997); *United States v. Wynn,* 845 F.2d 1439, 1443 (7th Cir.1988). As the government sees it, defense counsel misled the jury by creating the inference that the purpose of the IDOC hearing was to determine who actually wrote the letter, not who was responsible for it. As a result of this trial tactic, the IDOC appeared to have conducted a shoddy investigation. But we fail to see how this opens the door to testimony about the *result* of the disciplinary proceeding. On re-direct, the government needed to clarify the nature of IDOC's inquiry. It did so by asking Rivera to confirm that the IDOC was only "interested in determining whether the Defendant

was responsible for sending this threatening letter, not who wrote it." Tr. 56. The government simply went one step too far when it inquired about the outcome of the hearing. Accordingly, the district court should have upheld Thomas' objection pursuant to Rule 403.

■ Thomas is not entitled to a new trial, however, because the error was harmless. *See* Fed. R.Crim. P. 52(a); *Moore,* 115 F.3d at 1358. After review of the trial transcript, we are convinced that the jury would have found Thomas guilty even if it had been unaware of the result of the disciplinary proceeding. The evidence against Thomas was overwhelming. For instance, an IDOC investigator testified that Thomas said he could not be charged with respect to the December 1992 letter because he had instructed another inmate to write it. Tr. 61. When Thomas was incarcerated in Joliet, Illinois, Walker received letters with a Joliet postmark; when Thomas was transferred to Pontiac, Illinois, Walker received letters with a Pontiac postmark. Tr. 62–65. The jury also heard evidence of Thomas' animosity toward Walker, such as his statement to an IDOC investigator that if he saw Walker on the street he would "take a battery charge." Tr. 61–62. Moreover, Thomas' primary defense was that he could not read, and that therefore he had been unable to ascertain what his fellow inmates had written on his behalf. Tr. 68. But the jury was unlikely to believe this after they heard evidence that Thomas looked up information about Walker in a book. Tr. 82. Thomas also provided FBI agents with handwriting samples of words that appeared in the letters Walker received—like "dead" and "kill." And Thomas composed (not copied) sentences such as, "I was born in 9/3/67 at Springfield, Illinois. I am currently 27 years old. I am now in Pontiac, Illinois." Tr. 109. In light of all the evidence pointing to Thomas' guilt, there is not "a reasonable possibility" that testimony about the outcome of the IDOC proceeding "had a prejudicial effect upon the jury's verdict." *United States v. Berry,* 92 F.3d 597, 600 (7th Cir.1996). Accordingly, there is no need for a new trial or to reverse the district court.

## II. Sentencing

The district court increased Thomas' base offense level pursuant to U.S.S.G. § 2A6.1(b)(1), which mandates a six-level increase "[i]f the offense involved any conduct evidencing an intent to carry out" the threat. The district court explained:

In the instant case, the Court finds that the § 2A6.1 enhancement is valid. Defendant's letters to Carol Evans Walker were of a very violent nature. Furthermore, Defendant's own statements, including his statement that he would "take a battery charge if he saw Carol Evans Walker on the street," show that he had the intent to carry out his threats. Defendant is a violent man who wrote violent letters, and in the Court's opinion, fully intended to carry out his threats.

Order of 9/15/97 at 3 (citations omitted). Thomas argues that the district court considered impermissible evidence in concluding that the six-level enhancement was appropriate and, in the alternative, that the district court misconstrued the evidence presented to it. To the extent that Thomas' argument requires us to interpret § 2A6.1, our review is de novo. See United States v. Wilson, 98 F.3d 281, 282 (7th Cir.1996). Our review of the district court's factual determination is for clear error. See United States v. Sullivan, 75 F.3d 297, 302 (7th Cir.1996).

While this appeal was pending, the Sentencing Commission issued an application note which addressed a circuit conflict regarding "whether or not conduct which occurred prior to the making of the threat can evidence an intent to carry out the threat." U.S.S.G. § 2A6.1, Amendment 549. Although the amendment became effective after Thomas' sentencing, we may consider it because it "clarif[ies] rather than substantively change[s] the Guidelines." United States v. Downs, 123 F.3d 637, 643 (7th Cir. 1997) (citing § 1B1.11(b)(2)). The new application note provides that a sentencing court shall consider "conduct that occurred prior to the offense" so long as it is "substantially and directly connected to the offense, under the facts of the case taken as a whole." § 2A6.1, App. Note 2.

Here the government has conceded that the district court was referring to Thomas' criminal record—prior conduct—when it called Thomas "a violent man." But we have no means of knowing exactly which prior conduct the district court considered. And it was presented with quite a menu, since Thomas' presentence investigation report (PIR) chronicled nine adult criminal convictions, including three for aggravated assault and/or battery. The PIR also listed various arrests in which no action was taken, including aggravated battery of a pregnant woman. But whatever this rap sheet says about Thomas' propensity for violence, only one event is at all connected to Walker—the armed robbery which she prosecuted.

The robbery, however, is not analogous to what the Sentencing Commission had in mind when it directed courts to consider prior conduct that is "substantially and directly connected" to the instant offense. The cases that Amendment 549 cites favorably all involve prior conduct that was aimed at the recipient of the threats. In United States v. Taylor, for instance, the defendant conducted surveillance of his victims' home and hired a private investigator to gather information about them. See 88 F.3d 938, 943 (11th Cir.1996). In Sullivan, the defendant shot out the windows of his victim's car and truck. See 75 F.3d at 299. In United States v. Hines, the defendant stole a firearm and ammunition and traveled to where he believed his victim (President Bush) would be making an appearance. See 26 F.3d 1469, 1472 (9th Cir.1994). In United States v. Gary, the defendant had a history of violence and harassment against his victim. See 18 F.3d 1123, 1125–26 (4th Cir.1994); see also United States v. Carter, 111 F.3d 509, 513 (7th Cir.1997) ("In cases where a threat is only part of a long course of harassment, the court may consider prior conduct in assessing the seriousness of the threat."). Moreover, the Sentencing Commission stated that Amendment 549 adopted the view of the Eleventh Circuit. In Taylor and its precursor, United States v. Barbour, 70 F.3d 580 (11th Cir.1995), the Eleventh Circuit formulated three factors that help determine the probative value of pre-threat conduct: (1) the temporal proximity between the threat and the prior conduct; (2) the seriousness of the prior conduct; and (3) the extent to which

the prior conduct progresses toward carrying out the threat. *See Taylor*, 88 F.3d at 942 (citing *Barbour*, 70 F.3d at 587). Thomas' armed robbery cannot be described as "progressing toward carrying out" the threats he made in the letters. Walker was not the motivating factor behind the robbery; instead, she and Thomas became acquainted in its aftermath.

Of course, the Sentencing Commission directed courts to look at "the facts of the case taken as a whole," *see* Amendment 549, and the Eleventh Circuit recognized that the factors it set forth were non-exclusive and not always essential. *See Taylor*, 88 F.3d at 942. Thus there may be special situations where prior conduct that is *not* aimed at the victim of the threatening communication nonetheless indicates the defendant's intent to carry out his threats. In *United States v. Fonner*, 920 F.2d 1330 (7th Cir.1990), for example, the defendant sent a death threat to the commander of the Illinois State Police. The threat mentioned the commander's partner, whom the defendant had killed fifteen years earlier. *See id.* at 1332. Unquestionably, the fact that the defendant had already killed the partner suggested that he would carry through with his threat against the commander. *See id.* at 1333. Thomas' armed robbery, however, does not have this sort of special significance. At most, the robbery (as well as the convictions for battery and aggravated assault) suggest that Thomas has the propensity to carry through on his threats. But § 2A6.1(b)(1)—like criminal law in general—does not punish for propensity. *Cf.* Fed.R.Evid. 404. And evidence of propensity is an inadequate substitute for actual intent, which is the focus of § 2A6.1(b)(1). Moreover, a district court risks double-counting when it enhances a defendant's sentence on the basis of crimes that are unconnected to the threatening communication, since a "recidivism penalty" is "built into the guidelines." *Fonner*, 920 F.2d at 1334. For these reasons, the district court erred when it considered Thomas' criminal history in determining whether to apply the § 2A6.1(b)(1) six-level increase.

■ Thomas further argues that the district court impermissibly considered the three letters that were not charged in the indictment. The record does not indicate

which letters weighed into the district court's § 2A6.1(b)(1) analysis, but we assume for the sake of argument that the court examined all five letters, not just the two charged in the indictment. Thomas has seized on dicta in *Sullivan*, where we speculated about whether a November 1993 amendment to § 2A6.1 limited the sentencing court's inquiry to relevant conduct. As we explained in *Sullivan*, prior to the November 1993 amendment, § 2A6.1(b)(1) imposed a six-level enhancement " 'if the *defendant's* conduct involved any conduct evidencing an intent to carry out such a threat.' " 75 F.3d at 303 (quoting U.S.S.G. § 2A6.1, Amendment 480 (emphasis added)). After the amendment, the increase applied if the "*offense involved* any conduct evidencing an intent to carry out such threat." § 2A6.1, Amendment 480 (emphasis added). The amendment "responded to the possibility that the previous language precluded consideration of any conduct of others for which a defendant was responsible under § 1B1.3, Relevant Conduct." *Sullivan*, 75 F.3d at 303. Accordingly, "the amendment was intended to broaden the scope of conduct" which would constitute grounds for the six-level increase. *Id.* However, we noted, Amendment 480 may "limit consideration of the defendant's own conduct to that which 'the offense involved' "—relevant conduct under § 1B1.3. *Id.* We did not resolve the issue because it was not addressed by the parties.

When Thomas raised the relevant conduct issue, the Sentencing Commission had not yet issued Amendment 549. That amendment makes clear that § 2A6.1(b)(1) is not limited solely to relevant conduct, since the sentencing judge may consider all prior conduct that is substantially and directly related to the threatening communication. We are not certain whether Thomas believes that a portion of his relevant conduct argument can survive Amendment 549—that is, whether he would assert that the sentencing court's inquiry is limited to relevant conduct and prior conduct that is substantially and directly connected to the offense. This argument might find some support in the plain language of Amendment 549, which instructs courts to consider "both conduct that occurred prior to the offense and *conduct that occurred during the offense.*" § 2A6.1, Amendment 549 (em-

phasis added). *Compare* § 1B1.3(a) (instructing courts to consider all acts and omissions that occurred during the offense of conviction); *see also* § 1B1.1(*l* ) ("Offense means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."). But we can think of no reason why consideration of prior conduct would be subject to fewer limitations than consideration of subsequent conduct. And adoption of the relevant conduct approach would lead to inexplicable results.

The three uncharged letters illustrate the point. They were sent after the two letters charged in the indictment. They thus obviously are not *prior conduct*. They also are not relevant conduct.[1] As such, a sentencing court could not consider the letters if its inquiry were limited only to relevant conduct and prior conduct that relates substantially and directly to the offense. But if the government had charged Thomas with the last two letters that he mailed to Walker—instead of the first two—we would have no difficulty concluding that the other three letters were prior conduct that substantially and directly related to Thomas' offense. The point is that all five letters may be probative of whether Thomas actually intended to harm Walker; § 2A6.1(b)(1) could not have been designed to arbitrarily preclude the district court from considering three of them.[2]

■ We therefore conclude that Amendment 480—which made clear that a district court could consider the conduct of others for which the defendant is accountable under § 1B1.3—did not simultaneously *limit* the scope of the district court's inquiry to *only* relevant conduct. We concede, however, that the plain language argument is plausible

when considered strictly on its own terms. But it seems to us so lacking in any rational basis that we cannot attribute it to the Sentencing Commission. Accordingly, a district court making a § 2A6.1 determination should consider, in addition to relevant conduct, the "defendant's overt activity [substantially and directly] connected to the threat." *Carter,* 111 F.3d at 513. This means that the district judge was free to consider the three uncharged letters. And we find no clear error in its determination that the letters themselves suggested that Thomas intended to carry out his threats. *See, e.g.,* Letter of 12/21/93 (instructing Walker to "please ask yourself is this man is going to get you or not, because I know your addresses and I know your telephone number").

■ Thomas' final argument with respect to the six-level enhancement is that the district court should not have given weight to a comment that Thomas made to an IDOC investigator. When questioned about the letter that Walker received in October 1992, Thomas stated that "if he saw [Walker] on the street, he would take a battery charge." Tr. 61–62. Thomas asserts that this was mere idle talk, *see Sullivan,* 75 F.3d at 302, that was unrelated to threats he made in the letters. But it was not clearly erroneous for the district court to conclude that Thomas' statement indicated an intent to act on his threats. If Thomas lacked such intent, presumably his only reason for sending the letters was to frighten Walker—a cruel payback for her successful prosecution of his armed robbery. But the statement to the investigator could not have been designed to intimidate Walker, who was not present to hear it. Hence the comment suggests that Thomas wanted to do more than just scare Walker—

---

1. The government argues that the letters fall within the parameters of § 1B1.3 because they are part of the same course of conduct. This is incorrect. The same course of conduct analysis is inapplicable unless the letters—if charged as separate offenses—could be grouped as multiple counts under § 3D1.2(d). *See* § 1B1.3(a)(2); *United States v. Ritsema,* 31 F.3d 559, 565 (7th Cir.1994); *cf. United States v. Wyss,* 147 F.3d 631, 631–32 (7th Cir.1998). Offenses which fall under § 2A6.1 cannot be grouped under § 3D1.2(d). *See* § 3D1.2(d) ("Specifically excluded from operation of this subsection are: all offenses in Chapter Two, Part A....").

2. Or, to illustrate the point more dramatically, consider a scenario in which a defendant, several months after sending a threat, shoots out the windows of his victim's car and truck, narrowly missing the victim's child. This would *not* be relevant conduct under § 1B1.3. But it is undoubtedly probative of whether the defendant intended to carry through with his threat. And it is clear that if the shooting occurred before the making of the threat, the district court would be free to consider it. *See Sullivan,* 75 F.3d at 301.

that he instead desired to cause her actual physical harm.

Given Thomas' comment to the investigator, the nature of the letters themselves, and other facts—such as Thomas' knowledge of Walker's home address—the district court may have decided that a § 2A6.1(b)(1) enhancement was warranted regardless of Thomas' prior criminal record. But Thomas raises one other objection to his sentence, and the government concedes that we must remand on this point. The district judge declined to group Thomas' counts under U.S.S.G. § 3D1.2(b), which states that counts shall be grouped when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Amendment 549 has clarified that multiple counts of "making a threatening or harassing communication to the same victim are grouped together under § 3D1.2." Since we are remanding to allow this grouping, the district court should consider whether a § 2A6.1 enhancement is appropriate in light of facts that are properly before it.

AFFIRMED IN PART, REMANDED IN PART.