In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2778

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BERNARD S. BOHANON,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 747--Charles R. Norgle, Sr., Judge.

Argued April 4, 2002--Decided May 16, 2002


   Before RIPPLE, KANNE, and EVANS, Circuit
Judges.

   EVANS, Circuit Judge.  Fair warning: This
is an X-rated decision. The many letters
Bernard Bohanon wrote are extremely vile.
But because he contends that the sentence
he received for sending them (he was
convicted of mailing threatening
communications, in violation of 18 U.S.C.
sec. 876) was too long, we must recount
what he wrote to demonstrate why his 48-
month sentence to a federal prison will
not be disturbed on his appeal.

 Bohanon met up with the victims of his
letter-writing frenzy, Joe and Mary
Walker,/1 in 1991 when he contracted to
landscape the lawn of their home south of
Chicago. During work on the project, the
Walkers learned that Bohanon was having
financial difficulties, so they hired him
to do odd jobs, such as cutting the grass
and washing their car.

   The Walkers are naturalized citizens of
the United States, having emigrated from
Jamaica in the 1960's. Joe Walker worked
for United Parcel Service and Mary worked
for several years at a university. Since
1992, Sharon Connor, their niece who was
a nursing student, lived with them.

   Thinking Bohanon to be down on his luck,
the Walkers befriended him, taking him to

church functions and introducing him to their friends. They also shared dinners with him and took him to restaurants. Bohanon visited them frequently when he was living in Gary, Indiana. He spent the winter months in Texas, where he said he was working as a roofer.

In 1996 Bohanon asked the Walkers to store his car in their garage while he was in Texas. They agreed. Then, while Bohanon was in Texas, the Walkers started to receive Bohanon's mail at their home. When Bohanon returned to the Chicago area in the spring of 1997, the Walkers asked him to remove his car and stop having his mail sent to their home. At the same time, Bohanon began to show a romantic interest in Ms. Connor. Ms. Walker disapproved and told Bohanon so. She also told him not to come to the house while her husband was at work. Bohanon returned to Texas. But the Walkers' trouble with him was just beginning.

They and their niece started to receive letters, the tone of which, unfortunately, cannot be conveyed without direct quotations. So we quote a few of the letters (all part of the public record in the district court), misspellings and all:

From a letter addressed to Mr. Walker sent from Dallas, Texas, postmarked November 8, 1998:

I'd cut you and make your fat ass squeel like a big slimey pig. It's going to sound like a car burning rubber off the line. You are a bunch of bastards from hell whom all need to burn at the stake like witches of the old days. Someone ought to gut your niece and slash her throat, burn her nappy hair, cut her titties off, and shoot cement up her dry ass cock until she can't even squirt piss out of that nasty bloody same hole again. She will then have to wear a piss bag on the outside and be an embarrassment to all the human race. She should get her foot caught between the doors and the bus should drag that ugly, nasty, madoosa maggott in the street until the only thing left is a leg and a bag of piss. . . . Nobody can help or save you, it is extermination time.

From a letter addressed to Mr. Walker sent from Dallas, Texas, postmarked

January 29, 1999:

If I or any of my family members whom want you dead ever encounter you, you will die or receive the worst beating any man could ever imagine. You fucked with the wrong person. I have people who have seen you coming in and out of UPS and had serious guns ready to blow your head completely off your body before you got into your automobile. I of course know your every move so what do you think I'm going to do for the witchery you were putting in food I was eating at you wicked house. . . . I have some serious lunatics whom want to take your niece while she is on the bus stop and riddle her with bulletts. They've ridden right by her and looked her in the face and she didn't even know who they were. These people have killed before and have no problem with killing again. They are vicious killers.

   From a letter addressed to Mr. Walker sent from Dallas, Texas, postmarked February 27, 1999:

Yo mama is the deadest piece of third world dog sewage nigger in the grave of Foney ass Jamaica. Worms crawl all over her rotten carcus and she loves it. . . . This dead bitches skin has peeled off and her hair is so dry it feels like cardboard, I mean this bitch is dead. Your wife is next and when she hits the grave she will look like a big tub of nasty ancient. While doing the autopsy before her funeral, they are going to cut her rectum out and those sick doctors are going to fuck her with a big greasy louiville slugger until the bottom fall out of that rotten dead body. They will be vendictive and fuck her in the ears and eye sockets[,] piss on her dead carcus then take that wet greasy bat and beat her whole body until it sweals and swealters up like a balloon. . . . They will then urine on it, ten or fifteen different people and then prepare that black pile of shit for the wake. A word from you mother: Son I feel like a dried up bitch, I'm wrapped in worms like a dead mummy, it's mommy.

   From a letter addressed to "Black Goat Gobblins of the Third World" sent from Dallas, Texas, postmarked July 15, 1999:

There is no escape your third world

vomit, the time is coming for your reaping of the sowing of your evil dog teeth deeds. Hell is but a breath away. . . . I'm not through with you, I'm going to continue to attack you until you fall like a bag of garbage tossed into a dumpster.

From a letter addressed to "Black Nasty Ashey Bog of Vomit You Faggott Walker" sent from Gary, Indiana, postmarked March 11, 2000:

I see Fat Joe Walker lying in a casket and someone has pissed on him. I see a mat truck sitting on top of [Mrs. Walker's] car and her head has been ripped from that old ugly gorilla body. I see Sharon and she has been shot in the face and they shitted on her dead carcus. . . . Some vicious thugs are going to beat and rob [Mrs. Walker] before she has a bad car accident and dies from the head decapitation.

From a letter addressed to "Sick Black Nappy Necked Nigger" sent from Gary, Indiana, postmarked May 3, 2000:

You Nasty third world vomit. . . . Your worthless scum life is ending. You are on your way to the grave. Your casket will made from some old wood off of a vacant run down building.

Finally, from a letter addressed to "Black Scumk trash Maggott Attn: [Mr. Walker]" sent from Gary, Indiana, postmarked June 1, 2000:

You filthy fag sick garbage puke slime vomit mutt sooner mother fucker. . . . I wishes a vicious death upon your scum of the earth head. You watch your back you faggott bastard less you receive five bulletts in your spine. Your big black ugly maggott witch wife should be hung or burned at the stake like witches used to you Fat Fuck Motherfucker. If I weren't a child of God I'd catch you coming out of UPS and blow your head to dust particles. Nevertheless your wife is in store for a very dramatic/harmful incident. Before it is over that big black scorcerer will pay a debt to society like no other black bitch like her on earth.

The vileness was not confined to the letters themselves. The envelopes often contained obscenities. Some had notes

written on them. For example, an envelope was addressed to "Sharon, the ugly madoosa, Inc." On another envelope was the note, "I crave your insests." Envelopes addressed to Mr. Walker referred to his late mother in derogatory and obscene terms: "To my son, I have tapeworm in my rotten body. I feel like worm food & victim of sexual abuse."

One letter made direct reference to a violent incident from Bohanon's past, an incident he had discussed with Mr. Walker:

I've been through this before you see with another person, whom tried doing the same thing and he got shot very bad until he almost bled to death. I witnessed him lying in pool of blood and screaming for his life while the guy that shot him with the most powerful hand gun in the world sped away laughing.

Bohanon also sent letters to at least two of the Walkers' neighbors. In a couple of these letters he accused the Walkers of child molestation. He also wrote to Mr. Walker's employer. This letter purported to be a resignation letter from Walker himself in which he acknowledged stealing company property. Fortunately, Mr. Walker's employer found the letter suspect and did not act on it.

Nevertheless, it caused embarrassment. The letters to the neighbors caused the Walkers "immeasurable grief." Mrs. Walker testified at sentencing that their house was in a predominately white neighborhood; they and one other black couple were the "only blacks in the neighborhood." The neighbors, who showed her the letter, said "Someone is out to get you." Mrs. Walker testified that she looked at the letter and started crying "because it was so embarrassing, the things that was said in the letter, you know, to them, about raping their kids on the block, taking them in the basement."

Even worse than the embarrassment and grief, however, the letters also caused fear. Also at Bohanon's sentencing, Mr. Walker testified that he feared for his life and the lives of his family. He was afraid that Bohanon would send a letter bomb. One time when Mr. Walker called home from work and did not get an answer, he left work immediately to go home to

check on things. When he arrived, his garage door was open and he said he "almost died," thinking that Bohanon had gotten "someone to kill" his family. As a result of the letters, the Walkers altered their lifestyle. They installed an alarm in their home. They bought their niece a car so that she would not have to ride the bus when she traveled to and from the nursing school. Mr. Walker started parking his car in a different place at work. When they returned home after being out, the Walkers drove by the house before parking, checking to see that nothing was amiss. In short, they were on edge, constantly looking over their shoulders.

When the Walkers first complained to the police about the letters, they were told, we're shocked to note, that nothing could be done. They were advised to throw the letters away. Later, when they complained to the U.S. Postal Service, they were again simply advised to throw the letters away. The Walkers took this advice, and consequently there is no entirely accurate count of how many letters were sent. Estimates range from at least 100 to more than 300. Mrs. Walker stated that the letters were "just pouring in. Sometimes six letters for a day."

Bohanon eventually was charged with multiple counts of mailing threatening communications. At that time, he was incarcerated in the Will County, Illinois, jail, awaiting extradition to Texas for violating conditions of probation, which he was serving for a theft conviction. When he was interviewed by FBI agents, he admitted writing and mailing the letters. He claimed that the Walkers practiced voodoo and witchcraft and sought to control him by placing chicken blood and other things in his food. Eventually, he entered a plea of guilty to one count of mailing threatening communications and was sentenced to 48 months imprisonment.

The sentence was arrived at through a number of adjustments to the base offense level and a modest upward departure. Pursuant to sec.2A6.1(a)(1) of the United States Sentencing Guidelines, his base offense level was 12. Under U.S.S.G. sec.2A6.1, the base offense level was enhanced by 6 levels because there was conduct evidencing an intent to carry out

the threats in the letters. Two more levels were added because the offense involved more than two threats, resulting in an adjusted offense level of 20. The government sought, but was denied, an enhancement based on the contention that the conduct constituted a hate crime. Then Bohanon was granted a 3-level decrease for acceptance of responsibility as a reward for his guilty plea, bringing his total offense level to 17. He had five prior convictions, which resulted in the assignment of four criminal history points. Then because he committed the present offense while he was on probation for three 1999 theft convictions, he received two additional criminal history points, placing him in criminal history category III. The sentencing range after all this gymnastics was only 30 to 37 months.

Both sides moved for departures. Bohanon contended he was entitled to a downward departure pursuant to U.S.S.G. sec.5K2.13 for "Diminished Capacity." His request was denied. The government sought an upward departure on three bases. The first was Application Note 2 to U.S.S.G. sec.2A6.1, which provides that "[i]f the conduct involved substantially more than two threatening communications to the same victim or a prolonged period of harassing communications to the same victim, an upward departure may be warranted." The second was U.S.S.G. sec.5K2.3, which provides that "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range." Third, the government argued that an upward departure was appropriate under U.S.S.G. sec.5K2.8, which provides that "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct."

In regard to the government's motion for an upward departure, District Judge Norgle said:

I find that there is a basis under Guideline 2A6.1 to take this case to the maximum. And also looking at it from the government's perspective under 5K2.8 and

5K2.3, there is enough granting that upward departure to take the case to the maximum, which would be 60 months imprisonment.

After stating that Bohanon was a "troubled man" and recommending that his placement be in an institution that would provide mental health care and treatment, Judge Norgle also found that the conduct could not be excused. He said, however, that even though he had rejected the request for a downward departure based on diminished mental capacity, he did not intend to impose the maximum sentence. Taking all the factors into consideration, he settled on an upward departure of 11 months, imposing a sentence of 48 months.

Bohanon has appealed both the enhancement based on U.S.S.G. sec.2A6.1(b)(1)--that his conduct evidenced an intent to carry out the threats--and the upward departure, based on U.S.S.G. sec.sec.2A6.1, 5K2.3, and 5K2.8. His contentions are that the judge made findings which contradict the imposition of the enhancement, failed to explain clearly his reasons for the upward departure, and failed to link the extent of the departure to the structure of the guidelines. In short, his is the by-now familiar complaint that the district judge was not sufficiently explicit. Ironically, that complaint often arises in cases in which the basis for the enhancement or the departure is virtually self-evident so as to seem to require little explanation. Here, for instance, the judge said, "[N]o reasonable person could look at these letters and say that these were not serious threats to these individuals or to the public." When challenged, the court said more than once words like the following:

Do you want me to read the--all of these letters that are contained in the government's submission word-by-word?

Because that's--if that is what you would be asking me to do, then I would hand them over to you and let you read them into the record.

Or:

And you are not asking to read the

entirety of all these letters into the
record--

   . . . .

  --from which any reasonable person
could--

. . . .

  --infer that there are threats there,
and that there is an inference of an
intent to carry them out, and, based upon
what is said in the record and the
background of the defendant, that there
is the potential for him to carry them
out.

Judge Norgle obviously, and
understandably, found the letters
disturbing: he said he had "labored
through these terrible letters that Mr.
Bohanon wrote."

  In addition to finding the letters self-
evidently sufficient to support the
sentence imposed, however, the judge did
not neglect making explicit findings to
support the sentence.

  In order to impose the 6-level
adjustment in the offense level under
U.S.S.G. sec.2A6.1(b)(1), which governs
threatening communications, there must be
evidence of Bohanon's intent to carry out
the threats he made in the letters. The
comment to the guideline instructs the
district court to consider both conduct
which occurred prior to the offense if it
is "substantially and directly connected
to the offense" as well as conduct
occurring during the offense. United
States v. Sullivan, 75 F.3d 297 (7th Cir.
1996). Our review of the court's factual
determinations is limited; we will
reverse only when the determination is
"so inconsistent with the evidence" as to
constitute clear error. Sullivan, at 302-
03; United States v. Siegler, 272 F.3d
975 (7th Cir. 2001). Furthermore, in
certain cases, the threats themselves can
provide the basis for a conclusion that
the defendant intended to carry out his
threats. United States v. Thomas, 155
F.3d 833 (7th Cir. 1998).

  Here, the judge stated that the letters
themselves supported an inference that
Bohanon intended to carry out his
threats. Several went far beyond rambling

ruminations on Bohanon's hatred for the Walkers. For instance, in the January 29, 1999, letter, Bohanon references the location where, and manner in which, he intended to harm the Walkers and their niece. The level of detail in this letter-- referencing, for example, a place where the niece routinely stood-- provides an indication that Bohanon had moved beyond mere "talk . . . to talk which evidences an intent to act." United States v. Sullivan, 75 F.3d 297, 302 (7th Cir. 1996). This alone provided a solid basis for the 6-level adjustment under U.S.S.G. sec.2A6.1(b)(1).

In addition to the letters themselves, the judge noted that Bohanon had a prior conviction for unlawful carrying of a weapon, and thus another basis for concluding that he might just resort to the use of dangerous weapons. The adjustment is also supported by facts in the record which the judge did not explicitly mention: that during the time the threats were being made, Bohanon requested information about a 50-caliber semiautomatic pistol, and that in 1988 he had been present during the shooting of a friend. Upon this record, we conclude that applying the enhancement to Bohanon's offense level was not clearly erroneous.

We turn next to Bohanon's challenge to the upward departure, a decision we review only for an abuse of discretion. United States v. Jones, 278 F.3d 711 (7th Cir. 2002).

Looking at any of the three provisions on which the departure was based, we find that there was no abuse of discretion. First, there were at least 100 (and possibly as many as 300) letters sent. It is undeniably self-evident that 100 is "substantially more than two threatening communications to the same victim," as required by the application note to U.S.S.G. sec.2A6.1.

Second, a departure under U.S.S.G. sec.5K2.3 requires that the victims suffered psychological injury "much more serious" than normal from the commission of the offense. The Walkers testified as to their fear, humiliation, and embarrassment. They changed their behavior, becoming much more cautious than they had been. An inference that

they suffered psychological injury is clearly inferable from the record.

Finally, U.S.S.G. sec.5K2.8 authorizes an upward departure if the defendant's conduct was "unusually . . . degrading to the victim." Over and over, Judge Norgle noted that the letters were "terrible." The judge explicitly accepted the factual findings of the presentence report which described the embarrassment the Walkers felt. Both Walkers testified to their humiliation. The humiliation was increased because of the messages on the outside of the envelopes and the letters sent to the neighbors. Bohanon argues that this guideline should be limited to instances in which there was actual physical or sexual assault on the victims. The guideline itself, however, contemplates humiliation as a basis for the departure, saying that examples of "extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation."

In short, Judge Norgle found that the letters themselves support the inferences required for the departure. In addition, he explicitly accepted the findings set out in the presentence report, a practice we have upheld. See United States v. Parolin, 239 F.3d 922 (7th Cir. 2001). There is no clear error in departing from the guidelines.

Next, Bohanon argues that the departure was not properly linked to the structure of the guidelines, an argument we also reject. The departure was sufficiently based in the structure of the guidelines. But that aside, our examination of this record leads us to think that Bohanon should be happy that the judge was not more literal or mathematical in anchoring the departure to the guidelines. Had he been more literal, the departure would almost certainly have been greater. U.S.S.G. sec.2A6.1, which provides the base offense level in this case, requires that the offense level be increased by 2 levels if there were more than two threats. Then the application notes state that departure is warranted if the conduct involved "substantially more than two threatening communications." Bohanon's situation would be worse if the judge had concluded that if two threats means a 2-level increase, then 100 threats means a 100-fold increase. That

example shows why literal application and mathematical precision should not be the goal of guideline sentencing. While district judges are required to tie departures to the structure of the guidelines, they are not required to be mathematicians. Despite the absurdities sometimes involved in guideline sentencing, we have not yet deceived ourselves into thinking that mathematical precision is possible. We have said that the "degree of departure is entirely one of reasonableness . . . ." United States v. Peterson, 256 F.3d 612, 615 (7th Cir. 2001). Or, looking again at the fact that the guidelines call for a 2-level increase for more than two threats, we see that the increase, for instance, from level 12 to level 14 for someone in criminal history category III is from 15-21 months to 21-27 months--or about 6 months. Departing upward 11 months for the number of threats involved here is well below the range. As an aside, it is interesting to note that the upward departure roughly approximates an additional day for each letter--were we to credit the estimate that there were, in fact, over 300 letters, a conclusion which is not unreasonable. The judgment of the district court is AFFIRMED.

FOOTNOTE

/1 These are not their real names. We have changed them (and the name of the niece, who we will soon get to) to spare the victims further embarrass-ment.