*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0380P (6th Cir.)
File Name: 02a0380p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

No. 01-1502

TOMMY ANTHONY NEWELL,
  *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-80700—Robert H. Cleland, District Judge.

Argued: August 14, 2002

Decided and Filed: October 31, 2002

Before: MOORE and COLE, Circuit Judges; MARBLEY,
District Judge.*

_____

### COUNSEL

**ARGUED:** Nancy L. McGunn, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellant.
Daniel L. Lemisch, ASSISTANT UNITED STATES

---

*The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Nancy L. McGunn, Richard J. O'Neill, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Daniel L. Lemisch, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

—————

**OPINION**

—————

ALGENON L. MARBLEY, District Judge. Defendant-Appellant, Tommy Anthony Newell ("Newell"), appeals the district court's judgment on his conviction for transmitting threatening interstate communications in violation of 18 U.S.C. § 875(c). Newell assigns error to the district court's application of a six-point enhancement to his sentence based on the district court's finding that Newell's conduct evidenced an intent to carry out the threat that formed the basis of his conviction. This Court's appellate jurisdiction is proper under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

For the following reasons, the Court **AFFIRMS** the judgment of the district court.

### I. BACKGROUND

#### A. Factual Background

From December 1999 through August 2000, Newell had an intimate relationship with Cynthia Hamden, a married woman whom Newell met over the Internet. At the time of their initial meeting, Ms. Hamden's husband, Richard Hamden, was incarcerated. Throughout their relationship, Newell resided in Utah and Ms. Hamden resided in Michigan.

When they first met, Newell and Ms. Hamden communicated via the Internet, but eventually exchanged phone numbers, and began communicating over the telephone. In April 2000, Ms. Hamden flew to Newell's home in Utah, and stayed for approximately one week.

Therefore, the Court finds that the tone of the threats, along with Newell's other overt conduct, supported a six-level enhancement of Newell's sentence based on the fact that his conduct evidenced an intent to carry out the threats.

### IV. CONCLUSION

Based on the foregoing analysis, the Court **AFFIRMS** the district court's judgment and sentence on Defendant-Appellant's conviction for transmitting threatening interstate communications in violation of 18 U.S.C. § 875(c).

—————

by the court, the enhancement to the defendant's sentence would have been upheld.

not rely on the threats alone to apply a § 2A6.1(b)(1) six-level enhancement. *See United States v. Goynes*, 175 F.3d 350, 355 (5th Cir. 1999) (holding that "the writing of multiple threatening letters and the nature of their content alone are insufficient to justify" a six-level enhancement pursuant to § 2A6.1(b)(2)). *But see United States v. Thomas*, 155 F.3d 833, 838-39 (7th Cir. 1998) (finding that the five threatening letters that were sent to the victim by the defendant provided probative evidence of the defendant's intent to harm the victim). Indeed, it would not be proper for a district court to rely on the number of threats alone, as that fact is already taken into account by U.S.S.G. § 2A6.1(b)(2), which allows for a two-level enhancement "[i]f the offense involved more than two threats." U.S. SENTENCING GUIDELINES § 2A6.1(b)(2); *see Goynes*, 175 F.3d at 355 (reasoning that, if the Sentencing Commission accounted for the number of communications by imposing an enhancement under § 2A6.1(b)(2), then the number of threatening communications could not also be relied upon to trigger a six-level enhancement under § 2A6.1(b)(1)).

The district court properly analyzed the issue here in that the court did not rely on the threats alone in concluding that the enhancement was proper. To the contrary, the district court considered not only the nature and number of the threats, but also Newell's overt acts of purchasing a .32 caliber handgun and separately purchasing the requisite ammunition. This analysis wholly comports with the rule established by the majority of circuits that have addressed this issue, and adopted herein, requiring that the defendant engage in some overt conduct in addition to making the threats before a § 2A6.1(b)(1) enhancement can be sustained. *See Goynes*, 175 F.3d at 353 n.2 (listing cases adopting this rule).[7]

---

[7] Significantly, even in *Goynes* itself, the court noted that the defendant neither purchased a weapon or ammunition, nor traveled to the victim's home or city, nor engaged in "any other clearly recognizable overt act that could be considered conduct evidencing an intent to carry out his threat." *Goynes*, 175 F.3d at 355. The Court infers that, had there been evidence of some overt act similar to those specifically mentioned

During the course of their relationship, Newell also visited Ms. Hamden a number of times in Michigan when he traveled cross-country for his job as a long haul truck driver.

In August 2000, Ms. Hamden advised Newell that she wanted to terminate their relationship, as she had reconciled with her husband upon his release from prison. Soon after he received this news, Newell began sending harassing and threatening e-mail messages to Ms. Hamden. Between August 13, 2000 and September 11, 2000, Newell sent approximately seventy e-mail messages to Ms. Hamden.[1] He

---

[1] The following is a representative sampling of the e-mail messages Newell sent Ms. Hamden during this time period:

Sunday, August 13, 2000 12:50 p.m.

THE SILENT IT'S THE FUCKING SILENCE THAT FUCKS ME UP THE WORST AND YOU DON'T EVEN MENTIONED IT OR APOLOGIZE OR ANYTHING. THE SILENT TREATMENT YOU ARE GIVING WILL EVENTUALLY BE THE ONE THING THAT COULD CAUSE EVERYBODY PAIN.

August 19, 2000 11:08 p.m.

IF U WANT TO PLAY FUCKING GAMES THEN LETS PLAY. U R NOT THE ONLY ONE WHO CAN BE COLD HEARTED, AND I GARAUNTEE U WILL FUCKING LOOSE EVEN IF I DIE

August 25, 2000 5:00 p.m.

IT REALLY IS A BAD IDEA TO TURN YOUR BACK ON ME NOW THAT HE IS HOME. IT CAN DESTROY US ALL PLEASE I NEED YOU

Sunday, September 10, 2000 5:29 p.m.

I WILL NOT BE DISRESPECTED LIKE THIS. . . . I TRIED TO DO THIS YOUR WAY, BUT YOUR WAY HURTS TOO MUCH, I TAKE ALL THE PAIN WHILE YOU AND RICH HAVE FUN, WELL STARTING TOMORROW THE RULES ARE GOING TO CHANGE, BECAUSE I WILL NOT GO

also left threatening voice mail messages at her home, on her cellular phone, and at the homes of her family members.[2]

On or about September 6, 2000, a deputy from the Monroe County Sheriff's Department in Monroe County, Michigan warned Newell to stop contacting Ms. Hamden and her family members. Despite this warning, Newell continued with his

---

OUT LIKE THIS. NO FUCKING WAY]]]]]]

Monday, September 11, 2000 9:25 a.m.

WHY SHOULD I CARE IF YOU HATE ME OR NOT ANYMORE, I'LL STILL BE TREATED LIKE SHIT, BUT I AM GOING TO GIVE YOU A REASON TO HATE ME NOW. I TRIED YOUR WAY AND YOU JUST KEEP LYING AND BULLSHITTING, AND HURTING, WELL ITS TIME THAT I FUCKING FIGHT FIRE WITH FIRE.

[2]The following is a random sampling of the twenty-six voice mail messages Newell left for Ms. Hamden during this time period:

August 25, 2000 5:32 p.m.: ". . . I'm telling you right now. You're doing it the wrong way. If you're fucking smart you better stay close to me. If you're smart you'll talk to me. You're talking to someone now that's got nothing to lose. I don't give a fuck about jail or death. So you could be fucking smart."

Monday 9:47 a.m.: "I don't know what kind of game you're playing. I don't know why you had the phone cut off. That was the wrong move. Everything blows up right now."

Monday 6:06 p.m.: " . . . If I don't hear by from you by tomorrow, I'm calling your mom. If I don't hear from you by tomorrow, I'm calling Lisa . . . . And if I don't get no results from them, I'm getting on a plane, and coming up there. You're not going to fucking do this. Now you want to fucking play rough? It's going to get real fucking ugly. Do you want to fucking be stupid? . . . So the hell with you. And the hell with all of you. It's going to get real fucking nasty now."

Monday 6:27 p.m.: ". . . So you can do it the easy way or you think you want to fuck with me, then we will play. And I'll become your worst fucking nightmare. I'm not threatening you. This is not a threat. It's a fucking promise."

---

content of the threats cannot be deemed "conduct" independent of the communication itself to justify a six-level enhancement because the fact that the communications were angry or threatening is accounted for in the conviction for the charged offense.

Consideration of the tone of the threats, viewed in conjunction with the defendant's other overt conduct, is proper in determining whether the defendant intended to carry out his threats. *See United States v. Carter*, 111 F.3d 509, 513 (7th Cir. 1997) ("In deciding whether to apply the enhancement, courts may evaluate not only a defendant's overt activity connected to the threat, but also the nature and seriousness of the threats themselves."); *United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995) (considering the fact that the threatening letters contained language such as, "I'm going to blow you away," along with the defendants' overt act of possessing weapons in determining that the six-point enhancement was proper).[6] The district court, however, may

---

[6]We look to the holdings of our sister circuits regarding the ability of the sentencing court to rely on the threats themselves to conclude that the defendant intended to carry out those threats. Although this Court has addressed this precise issue, *see United States v. Lowenstein*, 1 F.3d 452 (6th Cir. 1993), it did so before § 2A6.1 was amended to include the current § 2A6.1(b)(2), which requires a two-point enhancement if the offense involved more than two threats. At the time that this Court decided *Lowenstein*, § 2A6.1(b) read, in relevant part, as follows:

(1) If the defendant engaged in any conduct evidencing an intent to carry out such threat, increase by 6 levels.
(2) If specific offense characteristic § 2A6.1(b)(1) does not apply, and the defendant's conduct involved a single instance evidencing little or no deliberation, decrease by 4 levels.

*See Lowenstein*, 1 F.3d at 453-54 (finding that § 2A6.1, as written in 1993, did not adequately take into account the number and deliberative nature of the threats involved, so that a six-level enhancement under § 2A6.1(b)(1) was proper when the defendant made thirty phone calls to the victim over eight months, and continued his behavior after the FBI warned him to stop). Because the current form of § 2A6.1(b)(2) does provide for an enhancement when the defendant makes multiple threats, *Lowenstein* is of minimal probative value.

*United States v. Green*, 25 F.3d 206, 211 (3d Cir. 1994) (upholding the six-level enhancement based on the fact that the defendant asked a friend, who was a police officer, to run a check on the victim's license plate so that he could learn the victim's address).

Significantly, this case is distinguishable from *United States v. Philibert*, 947 F.2d 1467 (11th Cir. 1991), *overruled on other grounds*, *United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir. 1994), on which the Defendant relies. In *Philibert*, the district court enhanced the defendant's sentence pursuant to § 2A6.1(b)(1) based on the defendant's purchase of a cache of weapons and ammunition fifty-three days before he made the threatening telephone call for which he was convicted. *Id.* at 1471. The circuit court reversed, finding that no evidence demonstrated a connection between the purchase of the firearms and an intent to carry out the threat made almost two months later. *Id.* Newell, unlike the defendant in that case, purchased the weapon on the very day he made the threats at issue. The temporal proximity of the purchase of the weapon to the making of the threats establishes a nexus between the two acts, and distinguishes this case from *Philibert*.

Accordingly, the Court concludes that Newell's purchase of a .32 caliber semi-automatic firearm and ammunition on the same day that he made the threat that formed the basis of the indictment demonstrates that his threats are "more than mere puffery," and evidences an intent to carry out the threats, thereby making appropriate a six-level sentence enhancement under U.S.S.G. § 2A6.1(b)(1).

### B. Tone of the Threats

The e-mail and voice mail messages left by Newell for Ms. Hamden during August and September 2000 contained exceedingly vulgar, angry, and threatening language. Moreover, his threat that formed the basis of the indictment contained explicit language indicating an intent to kill Richard Hamden. As the district court found, the messages conveyed a tone of "a man on a mission," determined to carry out his threats. Newell, however, argues that the tone and

communications. In particular, on September 19, 2000, Newell contacted a secretary at the elementary school where Ms. Hamden was employed as a bus driver. He told her that, "for the safety of the kids they need to get Cindy or the kids off the bus." He also left the following message on the telephone answering machine of Pat Miller, Ms. Hamden's mother:

> Please tell Cindy I don't know when she's going to get it through her fucking head. There's not a fucking cop on the planet that can stop me. She can call all the cops she wants. I'm going to Mississippi to say goodbye to my mom. I'm coming there. I'm going to fucking kill Richard. The only thing that's going to stop me is her. She is the only one that can stop me by calling or leaving a number where I can call her. She can bring all the fucking cops she wants and I will prove to everybody they will get me but I won't be fucking alive and there would be bodies with me. Thank you.

On the same day that he made the foregoing telephone calls, Newell purchased a .32 caliber semi-automatic handgun from a pawn shop in Roy, Utah. Because the pawn shop did not carry the proper ammunition, Newell made a separate purchase of ammunition at another location.

Following his purchase of the handgun, Newell traveled to Wyoming for work. On September 20, 2000, he was again contacted by an officer of the Monroe County Sheriff's Department, and was told to stop calling Ms. Hamden. After receiving that instruction from the police, Newell made no further contact with Ms. Hamden or her relatives. Newell subsequently traveled to Michigan for work, but did not contact Ms. Hamden while he was there.

On September 29, 2000, FBI agents arrested Newell at his home in Ogden, Utah. At the time that he was arrested, Newell was carrying a box containing the .32 caliber handgun that he had purchased on September 19, 2000, along with a .32 caliber magazine that contained eight live rounds of ammunition.

## B. Procedural History

On October 12, 2000, a one-count Indictment was filed in the Eastern District of Michigan charging Newell with transmitting threatening interstate communications in violation of 18 U.S.C. § 875(c). The charge was based on Newell's September 19, 2000 telephone call to the home of Mrs. Miller, during which Newell threatened to kill Richard Hamden. On October 18, 2000, the district court held a detention hearing and ordered Newell detained pending trial.

On December 21, 2000, Newell entered a plea of guilty to one count of transmitting threatening interstate communications in violation of 18 U.S.C. § 875(c). In the plea agreement, both the Government and the Defendant indicated that they anticipated that the sentencing range would be twelve to eighteen months, based upon an offense level of 12 and a criminal history category of II under the United States Sentencing Guidelines ("U.S.S.G."). They acknowledged, however, that the range was not binding upon the sentencing court.

The Probation Department issued a Presentence Report on January 25, 2001. In the report, the Probation Officer calculated a sentencing range of twenty-seven to thirty-three months. The officer arrived at that range by factoring in a six-point enhancement to Newell's offense level pursuant to U.S.S.G. § 2A6.1(b)(1), based on the conclusion that Newell engaged in conduct that demonstrated an intent to carry out the threat to kill Richard Hamden. The specific conduct cited by the Probation Officer was Newell's purchasing of a gun on the same day that he made the threat. The offense level also reflected a two-point enhancement, made pursuant to U.S.S.G. § 2A6.1(b)(2), based on the fact that the offense involved more than two threats.

The district court conducted a sentencing hearing on March 29, 2001. At the hearing, the Defendant objected to the six-point increase recommended by the Probation Officer pursuant to U.S.S.G. § 2A6.1(b)(1). The Defendant argued, *inter alia*, that the handgun that he purchased on September

In *Kirsh*, the defendants, husband and wife who sent threatening letters to numerous people throughout the United States between November 1990 and February 1992, were convicted of sending threatening communications through the mail. *Kirsh*, 54 F.3d at 1065-66. On appeal, the Second Circuit upheld the district court's six-level enhancement of their sentence based on the fact that two rifles were in their apartment at the time the threatening letters were being prepared and sent out, and at the time of their arrest. *Id.* at 1073. The court pointed out that one of the rifles had been purchased in the fall of 1991, and that the husband had asked whether the seller could supply him with ammunition, thereby evidencing an intent to carry out the threats. *Id.*

We agree with the analysis set forth in *Carter* and *Kirsh*, and hold that Newell's purchase and possession of a .32 caliber handgun in close temporal proximity to the making of the threats constitutes conduct that sufficiently supports a six-level enhancement under § 2A6.1(b)(1). Similar to the defendants in both *Carter* and *Kirsh*, Newell purchased and possessed a .32 caliber semi-automatic pistol and a matching magazine containing eight live rounds of ammunition on the same day that he made the threats.[5] The purchase of the weapon and ammunition on the very day he made the threats provides a clear indication that he intended to act on his threatening words, and had the means to do so. In addition, like the defendant in *Carter*, even though Newell lived in a different city than the victims, he knew where they lived in Michigan. The fact that he knew where they lived indicates that, once he purchased the weapon, he had the ability to carry out his threat. *See United States v. Sovie*, 122 F.3d 122, 129 (2d Cir. 1997) (acknowledging that the defendant's possession of the victim's address and phone number was relevant to the defendant's intent to carry out his threats);

---

[5] It is worth noting that Newell actually took a step beyond those taken by the defendants in *Kirsh*. He did not simply ask the supplier of the gun if he could also supply ammunition, but also took the next step of separately purchasing the ammunition when the gun seller could not supply it.

*See United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995) (upholding the district court's rejection of the defendants' claim that they had purchased guns for the legitimate activity of hunting as not credible). The court acknowledged that some of the evidence, indeed, supported Newell's argument, but it went on to weigh that evidence against the fact that the gun was purchased on the same day that the threats were made. The district court also weighed Newell's evidence against the considerable improbability that anyone with shooting experience would purchase a .32 caliber semi-automatic handgun simply for use at target practice.[4] As the district court aptly stated, such weapons are typically used for "concealment" and "personal protection" purposes, not for target practice. Therefore, the district court did not clearly err in determining that Newell did not purchase the firearm solely for use at target practice.

Having found that the handgun was most likely not purchased for use at target practice, the Court must consider whether as a matter of law, the purchase of the handgun constitutes conduct that evidences an intent to carry out the threat sufficient to sustain a six-level sentence enhancement.

In *United States v. Carter*, 111 F.3d 509 (7th Cir. 1997), the Seventh Circuit held that the defendant's sentence was properly enhanced based upon his intent to carry out his threats where the defendant had in his possession a Colt .45 semi-automatic pistol and three loaded, matching magazines at the time of his arrest. *Id.* at 513. The court concluded that the "fact that [the defendant] actually owned and carried firearms shows an easy ability to carry out his threatened violence, making his threats more than mere puffery." *Id.* at 514 (citations omitted). In addition, the court found the enhancement to be supported by the fact that, even though the defendant lived in a different city, he knew where the victim lived and how to find her. *Id.*

---

[4]In her letter to the court, Ms. Averill indicated that her family typically used b.b. guns, pellet guns, shotguns, and .22 caliber handguns for target practice.

19, 2000 was purchased for use in target practice, not to carry out his threats. To support this argument, Newell testified that he had gone to the store to purchase a .22 caliber pistol for use at target practice, but that the store did not have any such firearms, so he purchased the .32 caliber handgun instead. Newell also presented a letter written by a friend, Terry Averill, in which Ms. Averill explained that Newell had discussed with her his intent to purchase a pistol to use for target practice at the shooting range at her home. In addition, Newell presented evidence that he returned to the pawn shop where he had purchased the gun to correct an error in the paperwork that accompanied the firearm. He claimed that this action was not the act of an individual attempting to procure a firearm to carry out a threat. Furthermore, he noted that, after receiving the phone call from the police on September 20, 2000, he ceased making contact with Ms. Hamden, even when he traveled to Michigan for work. He stated that this cessation of communication demonstrated that the purchase of the weapon was not connected to the threats that he had made.

The court rejected Newell's arguments and found that the six-level enhancement applied to his sentence. In reaching its conclusion, the district court considered the following factors: (1) the extraordinary persistence of the Defendant in sending e-mail and voice mail messages; (2) the continuing undertone of threatening and extraordinarily angry language in the messages; (3) the temporal proximity of the purchase of the firearm to the making of the threats; (4) the separate purchase of the ammunition; and (5) the fact that the firearm could be loaded within a matter of seconds. The court also recognized that a .32 caliber pistol is usually purchased for "concealment" and "personal protection," not target practice. Accordingly, the court sentenced Newell to twenty-seven months confinement, followed by three years of supervised release.

The district court entered judgment on March 29, 2001. On that same day, Newell filed a timely notice of appeal.

## II.  STANDARD OF REVIEW

In reviewing challenges to sentences, this Court reviews the district court's legal conclusions regarding the application of the Sentencing Guidelines *de novo*, and reviews the district court's factual findings for clear error.  *United States v. Taylor*, 248 F.3d 506, 515 (6th Cir. 2001).  A finding is clearly erroneous when the decision "strike[s] us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Id.* (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir.1990)).

## III.  DISCUSSION

U.S.S.G. § 2A6.1(b)(1) provides: "If the offense [of making threatening communications] involved any conduct evidencing an intent to carry out such threat, increase [the offense level] by 6 levels."  U.S. Sentencing Guidelines § 2A6.1(b)(1).  In the Commentary accompanying the § 2A6.1, Application Note 2 states:

> In determining whether subsection[ ] (b)(1) . . . [applies], the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole.  For example, if the defendant engaged in several acts of mailing threatening letters to the same victim over a period of years (including acts that occurred prior to the offense), then for purposes of determining whether subsection[ ] (b)(1) . . . [applies], the court shall consider only those prior acts of threatening the victim that have a substantial and direct connection to the offense.

U.S. Sentencing Guidelines Manual § 2A6.1(b)(1), cmt. n.2.

The pivotal inquiry when determining the appropriateness of a § 2A6.1(b)(1) enhancement is whether the defendant intended to carry out the threat, and the likelihood that he

would actually do so.  *United States v. Gary*, 18 F.3d 1123, 1127-28 (4th Cir. 1994) (holding that any acts that evidence an intent to carry out the threats may form the basis for a § 2A6.1(b)(1) enhancement).  Accordingly, essential to the determination of whether to apply the six-point enhancement is a finding that a nexus exists between the defendant's conduct and the threats that form the basis of the indictment. *See United States v. Taylor*, 88 F.3d 938, 942 (11th Cir. 1996) (concluding that the essential inquiry under § 2A6.1(b)(1) is "whether the facts of the case, taken as a whole, establish a sufficiently direct connection between the defendant's . . . conduct and his threat").

Newell argues that none of the factors relied on by the district court to apply a six-point enhancement, viewed either alone or collectively, demonstrates a substantial and direct connection to his offense.  This Court, however, finds that both the purchase of the handgun in close temporal proximity to the making of the threats, and the tone communicated by the threats themselves, constitute conduct evidencing an intent to carry out the threats.

### A.  Purchase of the Handgun

First, the Court finds that the district court properly concluded, as a matter of fact, that the .32 caliber semi-automatic handgun purchased by Newell was probably not purchased for use in target practice, but instead was purchased in connection with the threats made against the Hamdens.[3]  In performing its role as the fact-finder at sentencing, the district court carefully weighed each of the pieces of evidence presented by Newell in support of his claim that he purchased the .32 caliber handgun only for use at target practice, and properly exercised its discretion in rejecting that evidence.

---

[3]Although the district court did not explicitly reject Newell's evidence presented in support of his contention that he purchased the handgun solely for use at target practice, it did so at least implicitly when it relied on the purchase of the handgun in support of the six-level enhancement.