# United States Court of Appeals
## For the First Circuit

No.  05-1559

UNITED STATES OF AMERICA,

Appellee,

v.

JODY DIXON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Saylor,* District Judge.

J. Martin Richey, Federal Defender Office, for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

May 26, 2006

---

*Of the District of Massachusetts, sitting by designation.

**SELYA**, **Circuit Judge**.  After defendant-appellant Jody Dixon pleaded guilty to five counts of mailing threatening communications, see 18 U.S.C. § 876, the district court determined that he harbored an intent to make good on his graphic threats. That finding precipitated a six-level enhancement under the applicable federal sentencing guideline.  See USSG §2A6.1(b)(1). The court then imposed a 115-month incarcerative sentence, corresponding to the top of the guideline sentencing range (GSR).

In this appeal, Dixon principally contends that the district court erred in applying the intent enhancement.  That contention requires us to construe, for the first time, the mechanics of that enhancement.  Secondarily, Dixon contends that the district court imposed an unreasonable sentence.  After careful consideration of these initiatives, we uphold both the intent enhancement and the overall sentence.

## I.  BACKGROUND

Roughly three years prior to the commission of the offenses of conviction, a Middlesex County (Massachusetts) Assistant District Attorney, Jill Goldstein, prosecuted Dixon for breaking and entering and related offenses.  On February 26, 2001, Dixon entered guilty pleas to a number of those charges and was ordered to serve over three years in prison.

We fast-forward to September 15, 2003.  On that date, while serving his sentence at the Souza-Baranowski Correctional

-2-

Center (SBCC) in Shirley, Massachusetts, Dixon mailed six envelopes: three to Goldstein, two to Middlesex County District Attorney Martha Coakley, and one to Massachusetts Attorney General Thomas Reilly. The envelopes, each of which contained a vile letter, were delivered the following day.

The letters sent to Goldstein included phrases such as "Kill Jill" (repeated over sixty times), "You will die soon," and "I hope you haven't forgotten are [sic] little date with a switch blade." At least one of these missives appeared to have been smeared with bodily substances (blood and excrement). One of the notes addressed to Coakley appeared to have been similarly smeared. In that communique, Dixon — who was HIV-positive and had been diagnosed with hepatitis B and C — wrote: "My Aids infected body fluid. Enjoy."

The envelope mailed to Reilly contained both a letter and a white powder. Laboratory testing later revealed that the white powder was not anthrax (as initially suspected) but a harmless compound. The letter itself appeared to have been smeared with the same sorts of bodily substances as the other letters. Its text read as follows: "Ashes to ashes and they all fall down. Think of all the memories lost like I give a shit. Actually I do give a shit and here it is along with my Aids infected blood. Enjoy."

While none of the intended recipients personally opened the envelopes, the office employees who performed that task were

-3-

fearful that they might have contracted infections. One of those staffers subsequently underwent several blood tests to ensure that Dixon's diseases had not been transmitted to him. Meanwhile, laboratory studies disclosed that "blood and matter consistent with fecal material were, in fact, smeared on the letters."

Because all the envelopes contained Dixon's name, inmate number, and address, the authorities had no difficulty in figuring out who was responsible for the mailings. On September 16, 2003 (the same day that the letters were delivered), a Massachusetts state trooper and a postal inspector repaired to SBCC. Dixon waived his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 444 (1966), and freely admitted writing and mailing the letters.

Dixon made a number of other damaging admissions to the investigators. For example, he explained that he would really like to kill Goldstein because of the way she had treated him during the prosecution of the breaking and entering offenses. Complaining that Goldstein thought she was "better than the rest," he boasted that he would murder her the next day if he was not incarcerated. He even spelled out his plan: he would lurk in a hallway of the Cambridge courthouse and use a knife to do the deed because he wanted to get "up close and personal" and watch Goldstein's blood-spattered body drop to the floor.

Although Dixon disclaimed any personal antipathy toward either Coakley or Reilly, he nonetheless stated that, if given the

-4-

opportunity, he would "cave both their heads in" with a baseball bat. Finally, he admitted that he had, in fact, smeared his blood and excrement on the letters. In that regard, he explained that, having contracted HIV and hepatitis B and C, he wanted other people to experience those diseases. He also professed a belief that it would be easier to pass along hepatitis than HIV through contact with the bodily substances coated on the letters.

In due course a federal grand jury, while eschewing a true bill with respect to one of the Coakley letters, charged Dixon with five counts of sending threatening communications through the United States mail. See 18 U.S.C. § 876. Within a matter of months, Dixon pleaded guilty to all five counts. The district court ordered the preparation of a presentence investigation report (the PSI Report).

The base offense level for the offenses of conviction was 12. See USSG §2A6.1(a)(1). The PSI Report recommended a six-level enhancement because the offenses involved conduct evincing an intent to carry out the threats. See id. §2A6.1(b)(1). It also recommended a two-level enhancement on the ground that more than two threats had been directed at Goldstein, see id. §2A6.1(b)(2), a three-level enhancement on the ground that the intended victims were government officials, see id. §3A1.2, a three-level enhancement under grouping rules, see id. §3D1.4, and a three-level reduction for acceptance of responsibility, see id. §3E1.1.

-5-

Dixon objected only to the recommended intent enhancement. He contended that he had sent the letters in order to remain in prison and that he never wished to harm the intended recipients. In support of that position, he produced a psychological evaluation performed by Scott Bresler, Ph.D. In his report, Dr. Bresler, relying in part on psychiatric records from both SBCC and Bridgewater State Hospital (BSH), concluded that Dixon was in a psychologically unbalanced state when he was first seen at BSH less than a month after sending the threatening communiques. Dr. Bresler also noted that, once Dixon had been transferred from SBCC to BSH, he told the resident psychologist (who diagnosed him as suffering from obsessive compulsive and generalized anxiety disorders) that he believed he lived better in jail than on the streets. In a personal interview with Dr. Bresler, Dixon reiterated his preference for life in prison, denied any memory of writing the letters, and claimed that he had "no intentions whatsoever" of harming the recipients. Dr. Bresler opined that Dixon never intended to follow through on his threats and only sent the letters because he "understood that [doing so] would lead to indictments and ultimately, to further incarceration."

The government countered with its own psychological evaluation, performed by Christine Scronce, Ph.D. While Dr. Scronce agreed that Dixon might have committed the offenses in part

to extend his immurement, she did not believe that this motivation negated a conclusion that Dixon wished to harm the intended recipients of the letters. Although Dixon told her that he did not really think that the recipients could contract his diseases through contact with the bodily substances smeared on the letters, Dr. Scronce questioned the veracity of that statement. She noted, among other things, Dixon's admission to her that he wrote the letters in order to lash out at the recipients, his lament that he did not realize that others would open the mail, his assurance that he never meant to harm unknown third parties (leaving the clear implication that he did mean to harm the addressees), and his admission to the investigators that he hoped the addressees would contract his diseases. Based on these and other facts, Dr. Scronce concluded that, at the time he committed the offenses, Dixon "believe[d] he might be able to harm his victims by including his blood and feces in the letters."

The district court convened the disposition hearing on March 15, 2005. The court explained that its practice, under the newly inaugurated advisory guidelines regime, was to "calculate and consult the Guidelines first and then consider whether there are any of the [18 U.S.C. §] 3553(a) factors that would indicate that another sentence would be more reasonable and appropriate."

In calculating the GSR, the district court overruled Dixon's objection to the intent enhancement; while it acknowledged

Dixon's apparent desire to remain behind bars, the court found that such a desire was not inconsistent with an intent to bring the threats to fruition and that Dixon (who, in the court's view, subjectively believed that he could transmit his diseases by smearing the letters with his blood and feces) was guilty of conduct evincing an intent to carry out the threats. The district court envisioned its finding on the intent enhancement as reinforced by Dixon's mailing of multiple letters and his statement to the investigators that he meant to harm the intended recipients. In the course of this ruling, the court deemed immaterial whether or not the diseases actually could be transmitted through the mail.

The intent enhancement, when coupled with the uncontroversial adjustments described above, yielded a total offense level of 23. Dixon was in criminal history category VI. Those integers produced a GSR of 92-115 months. See USSG ch. 5, pt. A (sentencing table). Despite Dixon's importunings, the court concluded that the factors enumerated in 18 U.S.C. § 3553(a) did not warrant any deviation from the GSR. It then imposed an incarcerative term of 115 months, explaining its rationale for doing so in exquisite detail. This timely appeal ensued.

## II. ANALYSIS

On appeal, Dixon assigns error to both the six-level intent enhancement and the reasonableness vel non of his sentence. We discuss these claims sequentially.

## A.  **The Intent Enhancement**.

The statute underlying the offenses of conviction criminalizes the knowing use of the mails to deliver a communication containing a threat to injure the addressee. 18 U.S.C. § 876. To obtain a conviction thereunder, showing that the perpetrator had an intention of seeing the threat through to fruition is not required. See United States v. Koski, 424 F.3d 812, 817 (8th Cir. 2005). Rather, it is sufficient to show that (i) the accused intended to make the menacing statement and (ii) the intended recipient reasonably could have regarded it as a threat. United States v. Schneider, 910 F.2d 1569, 1570 (7th Cir. 1990).

Even though proof of a defendant's intent to carry out a threat is unnecessary for establishing guilt under the statute of conviction, the Sentencing Commission has made it relevant to an evaluation of the seriousness of the conduct involved in the offense (and, thus, to the determination of an appropriate sentence). See USSG §2A6.1(b)(1) (calling for a six-level enhancement "[i]f the offense involved any conduct evidencing an intent to accomplish such threat"). Whether Dixon's conduct evinced an intent to carry out his threats implicates questions of both fact and law, and Dixon mounts challenges on both fronts. We afford clear-error review to his fact-bound challenges, see United States v. Jimenez-Otero, 898 F.2d 813, 814 (1st Cir. 1990), but

-9-

consider the essentially legal question of whether the facts sufficiently establish the requisite intent de novo, see United States v. Carrasco-Mateo, 389 F.3d 239, 243 (1st Cir. 2004).

**1.  The Factual Challenges**.  As a factual matter, Dixon asserts that the lower court clearly erred in drawing an inference that he believed he could transmit HIV and hepatitis by smearing his bodily substances on correspondence and, thus, in determining that he intended to harm the addressees.  In drawing the disputed inference, the court relied principally on the following evidence: (i) the letters were smeared with Dixon's blood and feces; (ii) they expressed his desire to infect the intended recipients; and (iii) Dixon was HIV-positive and had been diagnosed with hepatitis B and C.

Nothwithstanding this evidentiary array, Dixon argues that the court's inference is clearly erroneous.  He notes that the court never determined that it would be possible to transmit the viruses by mailing letters permeated with bodily substances. Without such proof, he avers, the remaining evidence is too flimsy to ground the court's finding.  This argument lacks force.

To be sure, a district court charged with determining whether a defendant believed it to be possible to effectuate a threat is free to consider the apparent impossibility of using a given means to achieve a given end.  See, e.g., State v. Block, 62 S.W.2d 428, 430 (Mo. 1933) (holding that a defendant could not

-10-

intend to commit a crime "if the means employed are so clearly unsuitable that it is obvious that the crime cannot be committed"). Withal, objective impossibility does not necessarily preclude subjective belief. See United States v. Joiner, 418 F.3d 863, 867 (8th Cir. 2005) (finding that defendants had the necessary scienter even though they incorrectly believed they could use U.C.C. financing statements to create a fraudulent lien on real estate). Although there may be cases in which factual impossibility is so nose-on-the-face plain as to negate any finding of subjective belief (say, for example, that the question was whether the defendant believed she could kill a person by hitting him over the head with a strand of spaghetti), this is not such a case. Even if we assume, for argument's sake, that it is impossible to transmit HIV and/or hepatitis by smearing bodily substances excreted by an infected person on a letter — and there is not a shred of proof to that effect in the record — that assumed fact is far from obvious. Indeed, at least one of the individuals who handled the threatening letters subsequently underwent extensive testing precisely because of his fear that infection might be possible.

Dixon also attacks, as against the weight of the evidence, the district court's conclusion that his admissions to the investigators provided additional support for an intent enhancement. Emphasizing Dixon's desire to remain behind bars, the absence of any proof that his diseases were communicable via the

-11-

tainted letters, and Dr. Bresler's testimony, Dixon seems to be saying that the district court clearly erred in attaching any weight to his admissions to the investigators.

Clear-error review is deferential. Under that standard, we must accept the lower court's findings of fact unless, after perusing the record as a whole, we are left with a strong and abiding conviction that a mistake has been made. See United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). The record here does not encourage such a conviction; the evidence is conflicting, and the resolution of these conflicts depends on which set of inferences the trier finds persuasive. Where, as here, the sentencing record supports two or more competing inferences, the sentencing court's choice among them cannot be clearly erroneous. See United States v. Ruiz, 905 F.2d 499, 507 (1st Cir. 1990).

Viewed in this light, Dixon's fact-bound challenges collapse. We hold, without serious question, that the sentencing court did not clearly err in finding that Dixon actually believed that he could transmit his diseases by smearing his bodily substances on the letters. Nor did the court clearly err in attaching weight to the admission that he meant to injure the intended recipients of his unsanitary epistles.

2. **The Legal Challenge**. Dixon next asseverates that the government's failure to offer proof that it would have been possible for him to transmit his diseases by mail precluded the

district court, as a matter of law, from applying the intent enhancement. This is a legal rather than a factual argument, suggesting that the facts as found by the sentencing court simply do not justify imposition of the enhancement. Consequently, the argument engenders de novo review. See, e.g., United States v. Newell, 309 F.3d 396, 400 (6th Cir. 2002); United States v. Taylor, 88 F.3d 938, 942 (11th Cir. 1996).

Although the district court looked to the totality of the circumstances in reaching its decision to invoke the intent enhancement, Dixon correctly points out that the record contains no evidence that it would be possible to transmit HIV and hepatitis viruses by smearing bodily substances on correspondence. Building on this foundation, he maintains that his beliefs and intentions with respect to his smearing of the letters provide no support for an intent enhancement and that the remaining facts are insufficient as a matter of law to sustain the enhancement.

This claim of error boils down to the thesis that factual impossibility is a legal defense to the imposition of the intent enhancement. We reject that thesis.

Factual impossibility occurs when a circumstance unknown to the defendant prevents him from achieving a specific objective.[2] See United States v. Waldron, 590 F.2d 33, 35 (1st Cir. 1979). On

---

[2]By contrast, legal impossibility exists when a defendant sets out to achieve an objective which, even if achieved as envisioned, will not constitute a crime. See United States v. Sobrilski, 127 F.3d 669, 674 (8th Cir. 1997).

Dixon's thesis, the proscribed objective is injuring the intended recipients and the unknown circumstance is the impossibility of transmitting his diseases by bodily substances smeared on correspondence. We proceed to examine the premise on which this thesis rests.

Recognizing that conduct falling short of a completed criminal objective still may pose a real threat to social order, we long have held that factual impossibility is not a defense to either liability or sentencing enhancements for inchoate offenses such as conspiracy or attempt. See, e.g., United States v. Belardo-Quiñones, 71 F.3d 941, 944 (1st Cir. 1995); United States v. Chapdelaine, 989 F.2d 28, 35 (1st Cir. 1993); United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987); Waldron, 590 F.2d at 34-35. Since the elements of those offenses do not require that the unlawful goal be achieved, factual impossibility is irrelevant. See Belardo-Quiñones, 71 F.3d at 944. It is against this legal mise-en-scêne that we turn to the sentencing guidelines in order to determine the relevant elements of the intent enhancement.

A court charged with the interpretation of a sentencing guideline should look first to the plain language of the guideline and, unless the Sentencing Commission has clearly indicated an intention to give a certain term a special or guideline-specific meaning, should apply that language as written, assigning commonly used words their ordinary meaning. See United States v. Thompson,

-14-

32 F.3d 1, 5 (1st Cir. 1994); United States v. Brewster, 1 F.3d 51, 54 (1st Cir. 1993). In this instance, section 2A6.1(b)(1) states that the six-level enhancement should be imposed "[i]f the offense involved any conduct evidencing an intent to carry out such threat." Given its ordinary meaning, this plain language denotes that the application of the enhancement turns on a defendant's subjective intent, without regard to factual impossibility.

In an effort to contradict this plain meaning, Dixon argues that the commentary to section 2A6.1 gives the word "intent" a special meaning, adding an element of likely success. Read in context, the commentary to which Dixon adverts furnishes no support for this optimistic argument.

Section 2A6.1 supplies sentencing guidelines for a host of crimes involving various forms of threatening or harassing communications. One common denominator of these offenses is that, typically, they criminalize conduct regardless of whether the putative defendant was merely trying to scare (rather than actually harm) the intended recipient. See, e.g., Koski, 424 F.3d at 817 (holding intent to carry out credible threat irrelevant to determination of guilt under 18 U.S.C. § 876); United States v. Stewart, 411 F.3d 825, 828 (7th Cir. 2005) (similar); see also United States v. Lincoln, 462 F.2d 1368, 1369 (6th Cir. 1972) (holding that, under the similarly structured "threatening the president" statute — 18 U.S.C. § 871 — it is not necessary that the

-15-

threat be uttered with a willful intent to carry it out). Therefore, proof that the defendant either desired to inflict physical harm or took any steps in that direction is not essential to a conviction.  See, e.g., Koski, 424 F.3d at 817.

Recognizing that this group of statutes spans a wide range of conduct, the Sentencing Commission compiled a number of specific offense characteristics to grade the seriousness of a defendant's conduct.  These specific offense characteristics are meant to distinguish conduct based "upon the defendant's intent and the likelihood that the defendant would carry out the threat." USSG §2A6.1, comment. (backg'd.).  It is this statement, Dixon suggests, that renders the specific offense characteristic at issue here — the intent enhancement — inapplicable where, due to factual impossibility, the threat cannot materialize.

This reading of the Sentencing Commission's background commentary elevates hope over reason.  The statement to which Dixon alludes is not specific to the intent enhancement but, rather, addresses the entire litany of specific offense characteristics listed under section 2A6.1.  That enumeration includes an array of different factors.  See, e.g., id. §2A6.1(b)(2) (dealing with the number of threats made); id. §2A6.1(b)(5) (dealing with the extent of the premeditation that went into making a particular threat). Consequently, the most natural interpretation of the commentary is one that respects the plain language of the intent enhancement: the

-16-

Commission formulated section 2A6.1(b)(1) to distinguish conduct based solely on a defendant's subjective intent. It then proceeded to design the remaining specific offense characteristics to distinguish conduct based on the likelihood that the defendant would succeed in carrying out his threat.

To sum up, this is not a situation in which the Sentencing Commission, in framing an enhancement, clearly aspired to employ a special or guideline-specific definition. Thus, we are duty-bound to read the intent enhancement as written, in accordance with its plain meaning. See Thompson, 32 F.3d at 5; Brewster, 1 F.3d at 54. Reading the guideline in that manner, a sentencing court must find that a defendant subjectively intended to carry out a threat before imposing the additional six levels. It follows inexorably that factual impossibility is no defense to the deployment of that enhancement and, therefore, that the district court did not commit legal error in applying the enhancement here.[3]

---

[3]We note in passing that there is some disagreement concerning whether a court, in imposing the intent enhancement, can rely solely on the threats that form the basis of the indictment or whether the defendant must engage in some overt conduct, over and beyond those threats, to evince the requisite intent. Compare United States v. Bohanon, 290 F.3d 869, 875 (7th Cir. 2002) (finding threats alone sufficient), with Newell, 309 F.3d at 404 (requiring exogenous conduct), and United States v. Goynes, 175 F.3d 350, 355 (5th Cir. 1999) (same). We need not probe this point for two reasons. First, Dixon never raised it. Second, this case involves at least two instances of exogenous conduct, namely, Dixon's act of smearing the letters and his subsequent admission to the investigators that he wanted to kill Goldstein. Hence, we leave the issue for another day.

## B.  **Reasonableness**.

We turn next to Dixon's back-up argument: that, even with the intent enhancement, his 115-month sentence is unreasonable.

The district court sentenced Dixon subsequent to the Supreme Court's watershed decision in United States v. Booker, 543 U.S. 220 (2005).  Booker rendered the guidelines advisory, id. at 245, and sentences imposed post-Booker are reviewable for reasonableness, regardless of whether they fall inside or outside the applicable GSR.  United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc).

Although the guidelines have become advisory rather than mandatory, determining the correct GSR remains an appropriate starting point for constructing a defendant's sentence.  See id. at 518.  Once the sentencing court has established the GSR (including a consideration of any applicable departures), it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a),[4] along with

_____

[4]Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment . . . ; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . the

any other relevant considerations.  Finally, it must determine, in light of that assessment, whether a sentence above, within, or below the GSR is warranted.  United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006).  The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing.  18 U.S.C. § 3553(a).

Reasonableness entails a range of potential sentences, as opposed to a single precise result.  See Jiménez-Beltre, 440 F.3d at 519; cf. United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990) ("Reasonableness is a concept, not a constant.").  Consequently — leaving to one side errors of law, see, e.g., United States v. Pho, 433 F.3d 53, 60 (1st Cir. 2006) — appellate review of a district court's post-Booker sentencing decision focuses on whether the court has "adequately explained its reasons for varying or declining to vary from the guidelines and whether the result is within reasonable limits."  United States v. Scherrer, 444 F.3d 91, 93 (1st Cir. 2006) (en banc).  Where the district court has substantially complied with this protocol and has offered a

applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ; (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . ; (6) the need to avoid unwarranted sentence disparities among defendants with similar records . . . ; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

plausible explication of its ultimate sentencing decision, we are quite respectful of that decision. See Alli, 444 F.3d at 40-41.

Here, the sentencing court's stated methodology comports with the Jiménez-Beltre protocol, and — aside from his attack on the intent enhancement, previously rejected, see supra Part II(A) — Dixon does not challenge the architecture of the GSR. Instead, he exhorts us to find that the court stumbled at the next step.

We start this phase of our inquiry with what the court said and did in crafting a 115-month incarcerative sentence. Using a wide-angled lens, the court focused on a variety of factors, including Dixon's long history of criminal activity, drug use, and instability; his admission that he functioned better in prison than in society; and the likelihood that he would have harmed the intended recipients of the letters had he not been confined. Citing these concerns, the court explained that its "primary purpose" in imposing the 115-month sentence was "to protect society from the danger that [Dixon] represent[s]." This is not only a record-rooted conclusion but also a reflection of a permissible consideration in the sentencing calculus. See 18 U.S.C. § 3553(a)(2)(C). The court added that it was sentencing Dixon at the apex of the GSR so as to send a message to other convicts who might "think that it's amusing to send threatening letters" to prosecutors. That statement, too, reflects a permissible sentencing consideration. See id. § 3553(a)(2)(B).

Dixon, ably represented, strives to persuade us that the sentencing court placed too much emphasis on deterrence while at the same time failing to consider other pertinent factors, such as the special "nature and circumstances of the offense[s]," id. § 3553(a)(1), and the need to provide "medical care, or other correctional treatment in the most effective manner," id. § 3553(a)(2)(D). As to the former, he argues that his conduct is best viewed as a "plea for help"; as to the latter, he argues that his drug addiction and mental health problems confirm that he needs assistance, not incapacitation.

If the court had completely disregarded these sentencing factors, this might be a different case. Here, however, the record makes manifest that the judge pondered each of the two factors cited by Dixon; he simply came to a different, yet altogether plausible, conclusion as to their salience. The court reasoned that Dixon's conduct, whether or not evincing a plea for help, showed that were he to be released before being given a meaningful opportunity for rehabilitation, he would pose a real danger both to the intended recipients of the letters and to society at large. The court also determined that a 115-month incarcerative term would afford Dixon sufficient time and opportunity to get his drug and mental health problems under control. To this end, the court cleared Dixon to participate in the correctional facility's 500-hour drug treatment program, suggested that the Bureau of Prisons consider the

psychological evaluations submitted by Drs. Bresler and Scronce, and noted that the correctional facility would be well-equipped to deal with Dixon's mental health needs.

This analysis is both sufficiently specific and sufficiently plausible. While a sentencing court must consider all of the applicable section 3553(a) factors, it is not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision. See Scherrer, 444 F.3d at 94; Alli, 444 F.3d at 41. Nor is there any requirement that a district court afford each of the section 3553(a) factors equal prominence. The relative weight of each factor will vary with the idiosyncratic circumstances of each case, see United States v. Sagendorf, ___ F.3d ___, ___ (1st Cir. 2006) [No. 05-1991, slip op. at 6], and the sentencing court is free to adapt the calculus accordingly. That is a common-sense proposition: in the last analysis, sentencing determinations hinge primarily on case-specific and defendant-specific considerations.

Our conclusion that the district court considered all the section 3553(a) factors brings us to the ultimate issue: the reasonableness vel non of the sentence imposed. That inquiry need not detain us. Given the court's supportable concern regarding the risk that Dixon would pose to society if prematurely released, there is an adequate basis in this instance for affording heavy weight to specific deterrence. With that in mind, and giving credence both

to the court's entirely plausible explication of why it chose a 115-month sentence and to the deferential standard of review, there is no principled way for us to label the sentence as unreasonable.

## III. CONCLUSION

We need go no further. To summarize succinctly, we conclude that the district court's decision to apply an intent enhancement under USSG §2A6.1(b)(1) is unimpugnable; that the court sufficiently considered all the relevant sentencing factors; that the court plausibly explained its rationale for the length of the sentence imposed; and that the sentence falls within the realm of reasonableness.

**Affirmed**.